# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 25-11469

_____

FLORIDA IMMIGRANT COALITION,
FARMWORKER ASSOCIATION OF FLORIDA,
Y.M.,
V.V.,

　　　　　　　　　　　　　　　　　　　　　Plaintiffs-Appellees,

*versus*

ATTORNEY GENERAL, STATE OF FLORIDA,
STATEWIDE PROSECUTOR OF THE STATE OF FLORIDA,
STATE ATTORNEY, FIRST JUDICIAL CIRCUIT OF FLORIDA,
STATE ATTORNEY, THE SECOND JUDICIAL CIRCUIT OF FLORIDA,
STATE ATTORNEY, THIRD JUDICIAL CIRCUIT OF FLORIDA,
et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:25-cv-21524-KMW

_____

Before JILL PRYOR, NEWSOM, and KIDD, Circuit Judges.

BY THE COURT:

  Florida's legislature recently passed, and its governor signed, a law creating two immigration-related state crimes. A federal district court soon granted a request to preliminarily enjoin a number of state officials from enforcing those crimes. Florida's Attorney General appealed. Before us now is a motion to stay the district court's preliminary injunction, and a motion to expedite the appeal. We deny the motion for a stay and grant in part the motion to expedite.

**I**

  This suit is about recent Florida legislation known as "SB 4-C." As relevant here, SB 4-C created two new state-law crimes. *See* Fla. Stat. §§ 811.102, 811.103 (2025). One forbids "unauthorized alien[s]" from "knowingly enter[ing]" Florida "after entering the United States by eluding or avoiding examination or inspection by immigration officers." *Id.* § 811.102(1). The other forbids the entry

into Florida or the presence in Florida of an "unauthorized alien" when the federal government has "denied admission, excluded, deported, or removed" him or when he "departed the United States during the time an order of exclusion, deportation, or removal is outstanding." *Id.* § 811.103(1). (For ease of reference, if somewhat imprecisely, we refer to § 811.102 and § 811.103 simply as "SB 4-C.")

Litigation ensued. Two non-profits and two individuals sued (in their official capacities) Florida's Attorney General, Florida's Statewide Prosecutor, and the state attorneys of Florida's 20 judicial districts; the plaintiffs also moved for a temporary restraining order and a preliminary injunction preventing the defendants from enforcing SB 4-C. The plaintiffs further moved for class certification. The district court issued an ex parte temporary restraining order "prohibiting Defendants and their officers, agents, employees, attorneys, and any person who are in active concert or participation with them from enforcing SB 4-C." Order at 14, Dkt. No. 28.

Despite the temporary restraining order, there are indications that enforcement of SB 4-C did not halt completely. According to the plaintiffs, some unknown number of arrests pursuant to SB 4-C took place *after* the district court entered the order. Following a hearing on the motion for a preliminary injunction—and, it seems, in light of the reports of arrests—the district court extended the temporary restraining order and, quoting Federal Rule of Civil Procedure 65, clarified that:

| | | |
|---|---|---|
| 4 | Order of the Court | 25-11469 |

> The TRO shall be interpreted to include among those "who are in active concert or participation with" Defendants or their officers, agents, employees, or attorneys, and thus prohibited from enforcing SB 4-C, the following: any officer or other personnel within any municipal or county police department within Florida, the Florida Department of Law Enforcement, or the Florida Highway Patrol, and any other law enforcement officer with power to enforce SB 4-C.

Omnibus Order at 1, Dkt. No. 49 (quoting Fed. R. Civ. P. 65(d)(2)(C)).

The Attorney General objected to the district court's interpretation of the temporary restraining order. Shortly after the district court issued the clarification, he sent a letter to various Florida law enforcement agencies explaining his view that the order was impermissibly broad, while also saying that the court "instructed my office to notify you that all Florida law enforcement agencies at present must refrain from enforcing Sections 811.102 and 811.103." Dkt. No. 57-2 at 2. A few days later he sent a second letter reiterating his view that the district court lacked the authority to extend its order to non-party law-enforcement officials. The letter added:

> Judge Williams ordered my office to notify you of the evolving scope of her order, and I did so. But I cannot prevent you from enforcing [SB 4-C], where there remains no judicial order that properly restrains you from doing so. As set forth in the brief my office filed today, it is my view that no lawful, legitimate order

25-11469               Order of the Court                    5

>   currently impedes your agencies from continuing to enforce [SB 4-C].

Dkt. No. 57-1 at 2.

The district court soon converted the temporary restraining order into a preliminary injunction, and provisionally certified two Rule 23(b)(2) classes. *Fla. Immigrant Coal. v. Uthmeier*, No. 25-21524-CV, 2025 WL 1423357 (S.D. Fla. Apr. 29, 2025). Like the clarified temporary order, the preliminary injunction expressly extends to all of Florida's law enforcement officials. The two classes are broad and include more or less any person who could be in violation of either of the two SB 4-C crimes. In the same order the district court directed the Attorney General to show cause why the second letter did not warrant holding him in contempt or sanctioning him.

The Attorney General appealed the grant of the injunction, and then moved for a stay of the injunction pending appeal, and to expedite the appeal.

## II

We deny the motion for a stay. When a party requests a stay of an injunction pending appeal, we consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (citation modified). "Ordinarily the first factor is the most important." *Garcia-Mir v.*

6                        Order of the Court                        25-11469

*Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). "But the movant may also have his motion granted upon a lesser showing of a substantial case on the merits when the balance of the equities identified in factors 2, 3, and 4 weighs heavily in favor of granting the stay." *Id.* (citation modified). We conclude that the stay factors do not favor the Attorney General here.

We discuss—very briefly, given this emergency posture—the following issues: (1) whether the plaintiffs have Article III standing; (2) whether they have a cause of action; (3) whether SB 4-C is preempted by the Immigration and Nationality Act; (4) whether the preliminary injunction should extend to non-party law-enforcement officials; and (5) the non-merits stay factors.

**A**

At very least, the individual plaintiffs, V.V. and Y.M., seem likely to succeed in showing that they have Article III standing. Both essentially concede that they are guilty of violating SB 4-C: According to the complaint, V.V. presently resides in Florida, has been deported in the past, and reentered the United States without inspection in 2014; Y.M. also resides in Florida and entered the United States without inspection decades ago. Compl. ¶¶ 16, 26–27, Dkt. No. 1. And police in Florida have apparently already made arrests under SB 4-C. The individual plaintiffs therefore likely can satisfy the Article III standing requirements to mount a pre-enforcement challenge to SB 4-C. *See Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1245 (11th Cir. 1998) (explaining that a plaintiff may demonstrate Article III standing in a pre-enforcement challenge if

25-11469          Order of the Court                    7

"(1) it was threatened with application of the statute; (2) application is likely; or (3) there is a credible threat of application").

## B

The plaintiffs are also likely to succeed in showing that their suit falls under *Ex parte Young*, 209 U.S. 123 (1908), which generally permits an official-capacity suit against a state officer who is alleged to be committing "an ongoing violation of federal law," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation modified). It is true that Congress may foreclose *Ex parte Young* actions—but Congress's "intent to foreclose" is generally expressed only when (1) it "express[ly] provi[des] [] one method of enforcing a substantive rule" and (2) the relevant federal-law right is "judicially unadministrable." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328–29 (2015) (citation modified). Neither condition seems to be satisfied here. To be sure, as the Attorney General says, the Immigration and Nationality Act is enforced by the Secretary of Homeland Security. But the plaintiffs do not seek to enforce immigration laws; instead, they argue that, by way of the Supremacy Clause *and* the Immigration and Nationality Act, SB 4-C is unconstitutional. Congress has not established any "one" method for enforcing federal preemption occasioned by the Immigration and Nationality Act. Nor do the interpretive questions here seem to involve the kind of "sheer complexity" that signals Congressional intent to "preclude the availability of equitable relief." *Id*. The Attorney General therefore has not made a "strong showing" on this issue.

8	Order of the Court	25-11469

## C

The preemption question is a closer one. But we're mindful that the burden in this posture is for the Attorney General to make a "strong showing" that he is likely to succeed on the merits. And we do not think he tips the balance in his favor.

A few cases guide our thinking. First, *Arizona v. United States*, 567 U.S. 387 (2012). There, the Supreme Court took the view that "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer" and emphasized "the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 408–09. Second, *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012). In that case, we concluded that "[t]he INA provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens." *Id.* at 1263. And we pointed out that "the federal government has clearly expressed more than a peripheral concern with the entry, movement, and residence of aliens within the United States." *Id.* at 1264 (citation modified). Third, *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012). There, we recognized that "[t]he power to exclude and the related federal power to grant an alien permission to remain 'exist as inherently inseparable from the conception of nationality.'" *Id.* at 1293 (quoting *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936)).

The eventual application of preemption doctrine in this case is sure to be quite involved. After all, field preemption is "rare."

*Kansas v. Garcia*, 589 U.S. 191, 208 (2020). And we emphasize that this order does not definitively resolve the preemption issue. But at this preliminary stage, we cannot conclude that the Attorney General has made the necessary "strong showing." A state statute is field preempted when "Congress, acting within its proper authority, has determined [that the field] must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (citation modified). It seems likely—given the federal government's longstanding and distinct interest in the exclusion and admission of aliens, and the Immigration and Nationality Act's extensive regulation of alien admission—that this principle is satisfied with respect to the field of alien entry into and presence in the United States. Accordingly, the Attorney General has not made a "strong showing" that the district court was wrong to conclude that SB 4-C is likely field preempted.

## D

The Attorney General asks that we at least stay the district court's preliminary injunction insofar as it extends to non-party law-enforcement officials. We decline to do so.

It may be that the district court was wrong to enjoin non-party law-enforcement officials from using SB 4-C. After all, it seems that in at least some respects, the Attorney General (and the

other named defendants) are distinct entities from at least many of Florida's law enforcement officials. *Contrast* Fla. Const. art. IV, § 4(b) (creating the office of the Attorney General), *and id.* art. V, § 17 (creating the office of state attorney in each judicial district), *with id.* art. VIII, § 1(d) (providing for the election of county sheriffs). And in analogous contexts we've sometimes been skeptical about arguments that statewide officials control local officials. *Cf., e.g.*, *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296–1305 (11th Cir. 2019) (en banc); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253–58 (11th Cir. 2020); *City of S. Miami v. Governor*, 65 F.4th 631, 640–45 (11th Cir. 2023). Distinctions like this can matter because federal courts' "power is . . . limited": Courts enjoin particular officials from enforcing a statute—they do not enjoin the statute itself. *Jacobson*, 974 F.3d at 1255. That said, we recognize that the precise interpretation of Rule 65(d)(2)'s boundaries is tricky.

Nevertheless, at this preliminary stage, we deny even a partial stay. That is because, whether he is right or wrong about his control over other law-enforcement officials, the Attorney General has not made a "strong showing" on this issue.

Suppose that the plaintiffs are right, and the Attorney General, the state attorneys, and the various law enforcement officials are all (in effect) a single monolithic entity. In that case, the relevant standard for assessing the scope of the district court's order is the principle "that remedies should be limited to the inadequacy that produced the injury in fact that the plaintiff has established, and [be] no more burdensome to the defendant than necessary to

25-11469               Order of the Court                    11

provide complete relief to the plaintiffs." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022) (citation modified). The order's scope seems consistent with that principle—again, supposing that the plaintiffs are right. The plaintiffs sought and obtained a sweeping provisional class certification, and so the relevant parties to the litigation (for our purposes) are essentially all people against whom SB 4-C might be enforced. The Attorney General criticizes what he calls a "universal" injunction, but he does not meaningfully contest the propriety of the class certification in the stay motion. And in any event, this kind of provisional class certification is not unheard of. *Cf. A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 (2025). Accordingly, on the plaintiffs' theory of the relatedness between the Attorney General and state law-enforcement agencies, it seems sensible for the district court to enjoin from implementing SB 4-C the various officials who might be a part of the enforcement effort. Otherwise, the efficacy of the district court's order would be thwarted.

Alternatively, suppose that the Attorney General is correct: Florida's law-enforcement officers are totally separate entities over which he has no meaningful control; they have different sources of authority in state law; and they serve separate functions under Florida's constitution. If that is true, then we doubt that the Attorney General has Article III standing to appeal the portion of the district court's order enjoining other state law-enforcement officials.

"It is a jurisdictional requirement that litigants establish their standing not only to bring claims, but also to appeal judgments."

*Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1244 (11th Cir. 2023) (citation modified); *accord Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) ("The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." (citation modified)). Hence, "[o]nly a litigant who is aggrieved by the judgment or order may appeal." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1354 (11th Cir. 2003) (citation modified). The problem for the Attorney General is that, on his own theory, he is *not* aggrieved by the portion of the district court's order enjoining non-party law-enforcement officials. Instead, it is those (separate) law-enforcement officials who are aggrieved—and the Attorney General, having effectively disavowed any relationship to them, is (apparently) seeking to vindicate *their* rights and mitigate *their* injuries. That is not consistent with Article III's limits on our jurisdiction, even though the Attorney General clearly *does* have standing to appeal the bulk of the district court's order. *Cf. id.* ("Thus, it is entirely possible that named defendants in a trial proceeding, who would doubtless have appellate standing for the purposes of challenging some final rulings by the trial court, could lack standing to appeal other trial court rulings that do not affect their interests.").

That is not to say that nobody can challenge the district court's extension of its injunction to non-parties. Although "[g]enerally, one not a party lacks standing to appeal an order in that action," *id.* (citation modified), we have recognized that "a nonparty may be sufficiently bound by a judgment to qualify as a party for purposes of appeal . . . when the nonparty is purportedly bound by

an injunction," *AAL High Yield Bond Fund v. Deloitte & Touche LLP*, 361 F.3d 1305, 1310–11 n.10 (11th Cir. 2004); *accord, e.g.*, *SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 291 (5th Cir. 2024); *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998); *In re Piper Funds, Inc.*, 71 F.3d 298, 301 (8th Cir. 1995); *Hilao v. Est. of Marcos* (*In re Est. of Marcos Human Rights Lit.*), 94 F.3d 539, 544 (9th Cir. 1996). Accordingly, if the various enjoined state law-enforcement officials are displeased with the district court's order, they likely may appeal from it. But they have not done so here.

The Attorney General may be right about his control over other law-enforcement officials. But it is not entirely obvious, and we conclude that—whether he is right or wrong about the district court's authority under Rule 65(d)—he has not made a "strong showing."

E

Last of all, we consider the non-merits stay factors. *See Garcia-Mir*, 781 F.2d at 1453. Four considerations seem especially relevant to us.

*First*, the Attorney General plausibly argues that he may be irreparably harmed by the preliminary injunction because "the inability [of a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602–03 n.17 (2018); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). This would matter a great deal had the Attorney General made a strong showing on the merits. But because his success is quite uncertain, this particular harm is less

relevant. *Cf. Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law.").

*Second*, the Attorney General also says that vindicating "the State's power to stem the tsunami of effects from illegal immigration is critical." Mot. to Expedite at 5. But even assuming that "effects from illegal immigration" is an irreparable harm, we are not sure how this particular law could be a decisive part of mitigating that harm. Federal officials of course already enforce immigration law—and many Florida law-enforcement agencies have entered into agreements with the Department of Homeland Security that allow local police to enforce federal immigration law.

*Third*, the equities seem to cut against the Attorney General—and in any event do not cut in his favor—given his seemingly defiant posture vis-à-vis the district court. Again, he may well be right that the district court's order is impermissibly broad. But that does not warrant what seems to have been at least a veiled threat not to obey it. *See In re Novak*, 932 F.2d 1397, 1400 (11th Cir. 1991) ("[A]n order duly issued by a court having subject-matter jurisdiction over a case or controversy before it, and personal jurisdiction over the parties to that case or controversy, must be obeyed, regardless of the ultimate validity of the order.").

*Finally*, the public interest (as we see it) is served by maintaining the pre-SB 4-C status quo. Certainty and predictability will be promoted by limiting enforcement of SB 4-C at least until this litigation has reached a more decisive point.

★ ★ ★

We therefore deny the motion for a stay. This is a difficult case, and this order does not finally resolve the issues. The parties will have another bite at the apple once they reach the "merits" of the preliminary-injunction appeal. And, should the preliminary injunction become permanent, the parties would then have a third bite on appeal. But at this stage, and given the accelerated timeline, we are not persuaded that the Attorney General has carried his burden to obtain the extraordinary relief he seeks.

### III

The Attorney General also moved for expedited consideration of the stay pending appeal and to expedite the appeal. Insofar as some of his proposed deadlines have already passed, his request to expedite consideration of the motion to stay has been effectively denied. We however grant his motion to expedite the appeal and direct that the case be calendared for oral argument at the next available sitting.

### IV

For the foregoing reasons, the appellants' motion to stay the injunction pending appeal is **DENIED**.

Appellants' motion to expedite the appeal is **GRANTED IN PART**.

The Clerk is **DIRECTED** to place this appeal on the argument calendar for the week of October 6, 2025, in Atlanta.

Briefing shall proceed in keeping with the current schedule, as set by the briefing notice issued on May 20, 2025.