# In the United States Court of Appeals
# for the Eleventh Circuit

FLORIDA IMMIGRANT COALITION, ET AL.,
*Plaintiffs-Appellees,*

v.

JAMES UTHMEIER,
IN HIS OFFICIAL CAPACITY AS FLORIDA
ATTORNEY GENERAL, ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 1:25-cv-21524-KMW

## APPELLANTS' INITIAL BRIEF

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
NATHAN A. FORRESTER
  *Chief Deputy Solicitor General*
ROBERT S. SCHENCK
CHRISTINE PRATT
  *Assistant Solicitors General*
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*robert.schenck@myfloridalegal.com*

June 30, 2025                    *Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendants certify that, to the best of their knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Amdur, Spencer

2. Bakkendahl, Thomas

3. Bartlett, Bruce

4. Basford, Larry

5. Brodsky, Ed

6. Campbell, Jack

7. Chavez, Paul R.

8. Choi, Grace

9. Costello, David M.

10. Cox, Alexcia

11. Cox, Nicholas B.

12. DeSousa, Jeffrey P.

13. Durrett, John

14. Farmworker Association of Florida, Inc.

15. Florida Immigrant Coalition

16. Fox, Amira D.

17. Gladson, William

18. Godshall, Amy N.

19. Goodman, Hon. Jonathan

20. Greer, Alana J.

21. Haas, Brian

22. Haskell, Miriam F.

23. Jadwat, Omar

24. Kacou, Amien

25. Kramer, Brian S.

26. Lamia, Christine

27. Larizza, R.J.

28. LaRocca, Christina I.

29. Lopez, Susan S.

30. Madden, Ginger Bowden

31. Mann, William C.

32. Nelson, Melissa

33. Pratt, Christine K.

34. Pryor, Harold F.

35. Roman, Oscar S.

36. Rundle, Katherine Fernandez

37. Scheiner, William

38. Schenck, Robert S.

39. Stafford, William III

40. Steinberg, Hannah

41. Tilley, Daniel B.

42. Uthmeier, James

43. V.V.

44. Wiese, Evelyn

45. Williams, Hon. Kathleen M.

46. Wofsy, Cody

47. Worrell, Monique H.

48. Y.M.

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

**ORAL ARGUMENT STATEMENT**

Defendants respectfully request oral argument, which will help the Court decide the important legal issues raised by this case. In particular, this case presents critical questions of first impression about the enforceability of Florida's SB 4-C, a law designed to protect Florida from the effects of illegal immigration. The case also presents pressing questions about the propriety of binding non-parties through injunctive relief, and the proper scope of the district court's equitable authority.

# TABLE OF CONTENTS

Oral Argument Statement ........................................................................... i

Table of Authorities ............................................................................... iv

Statement of Jurisdiction ......................................................................... 1

Issues Presented ..................................................................................... 2

Introduction .......................................................................................... 4

Statement of the Case ............................................................................. 6

      A.    The Crisis at the Southern Border ....................................... 6

      B.    SB 4-C .................................................................................. 7

      C.    Procedural History .............................................................. 8

Standard of Review ............................................................................... 11

Summary of Argument .......................................................................... 12

Argument ............................................................................................. 18

I.    Plaintiffs have failed to show that they are likely to succeed on the
merits. ............................................................................................. 18

      A.    Plaintiffs lack standing to attack SB 4-C. ......................... 18

            1.    The unnamed, individual Plaintiffs lack standing. ......... 18

            2.    The organizational Plaintiffs lack standing. .................. 22

      B.    Plaintiffs lack a cause of action to enforce federal
immigration law. ............................................................... 23

      C.    SB 4-C is not facially preempted by federal immigration law.
....................................................................................... 27

            1.    SB 4-C is not field preempted in all applications. ........ 28

            2.    SB 4-C is not conflict preempted in all applications. .... 33

D.     SB 4-C does not violate the Dormant Commerce Clause. ........................36

II.     The remaining equitable factors do not support an injunction. ...........................37

III.    The district court lacked authority to bind Florida's law-enforcement officers. ........................................................................38

    A.     The district court erred in binding non-party law enforcement. ..................................................................39

    B.     The motions panel's appellate standing analysis was wrong too. ..............................................................................50

Conclusion ..................................................................................................52

Certificate of Compliance .......................................................................53

Certificate of Service ...............................................................................54

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
    557 F.3d 1177 (11th Cir. 2009) ........................................................................11

*ADT LLC v. NorthStar Alarm Servs., LLC*,
    853 F.3d 1348 (11th Cir. 2017) ......................................39, 43, 44, 48, 49

*Alemite Mfg. Corp. v. Staff*,
    42 F.2d 832 (2d Cir. 1930) ...........................................5, 17, 39, 43, 48

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................ 4, 15, 25, 26, 28, 29, 30, 31, 32, 34, 35

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ...............................................................23, 25, 27

*Barber v. Gov. of Ala.*,
    73 F.4th 1306 (11th Cir. 2023) ........................................................................11

*Bilida v. McCleod*,
    211 F.3d 166 (1st Cir. 2000) ........................................................................46

*Bonner v. City of Prichard*,
    661 F.2d 1206 (11th Cir. 1981) ........................................................................51

*Chamber of Com. of U.S. v. Whiting*,
    563 U.S. 582 (2011) ........................................................................33

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018) ........................................................................28

*City of South Miami v. Governor of Fla.*,
    65 F.4th 631 (11th Cir. 2023) ...............................................22, 41, 49

*City of Tuscaloosa v. Harcros Chems., Inc.*,
    158 F.3d 548 (11th Cir. 1998) ........................................................................40

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
    538 U.S. 440 (2003) ........................................................................40

*Cmty. for Creative Non-Violence v. Reid,*
490 U.S. 730 (1989) ...................................................................................40

*Coal. for Competitive Elec., Dynegy, Inc. v. Zibelman,*
272 F. Supp. 3d 554 (S.D.N.Y. 2017) ......................................................24

*Combs v. Snyder,*
101 F. Supp. 531 (D.D.C. 1951) ................................................................38

*Corey v. Rockdale Cnty.,*
689 F. Supp. 3d 1251 (N.D. Ga. 2023)......................................................24

*Cousins v. Sch. Bd. of Orange Cnty.,*
687 F. Supp. 3d 1251 (M.D. Fla. 2023) ....................................................22

*CTS Corp. v. Waldburger,*
573 U.S. 1 (2014) ...............................................................................14, 32

*Davis v. Passman,*
442 U.S. 228 (1979) ...................................................................................23

*DeCanas v. Bica,*
424 U.S. 351 (1976) .............................................................................28, 31

*E. Bay Sanctuary Covenant v. Trump,*
932 F.3d 742 (9th Cir. 2018) .....................................................................19

*Edwards v. California,*
314 U.S. 160 (1941) .............................................................................16, 37

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ...................................................................................41

*General Bldg. Contractors v. Pennsylvania,*
458 U.S. 375 (1982) .............................................................................42, 43

*Gentile v. Bauder,*
718 So. 2d 781 (Fla. 1998) .........................................................................45

*Georgia Latino Alliance for Human Rights v. Governor of Georgia,*
691 F.3d 1250 (11th Cir. 2012) ...............................15, 25, 31, 33, 34, 35, 36

*Gonzaga Univ. v. Doe,*
536 U.S. 273 (2002) ...................................................................................26

*Griffin v. Dugger,*
823 F.2d 1476 (11th Cir. 1987) ...............................................................21

*Grupo Mexicano de Desarrollo S.A., v. All. Bond Fund, Inc.,*
527 U.S. 308 (1999) ...................................................................................27

*Havens v. James,*
76 F.4th 103 (2d Cir. 2023) ......................................................................47

*Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.,*
768 F.2d 1558 (11th Cir. 1985) ...............................................................49

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.,*
471 U.S. 707 (1985) ...................................................................................28

*Hines v. Davidowitz,*
312 U.S. 52 (1941).....................................................................................31

*Initiative & Referendum Inst. v. Walker,*
450 F.3d 1082 (10th Cir. 2006) ...............................................................19

*Isr. Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.,*
16 F.3d 198 (7th Cir. 1994) ......................................................................25

*Jacobson v. Fla. Sec'y of State,*
974 F.3d 1236 (11th Cir. 2020) ...................................... 18, 22, 42, 43, 48, 49

*Jefferson Cnty. v. Acker,*
210 F.3d 1317 (11th Cir. 2000) ...............................................................36

*Kansas v. Garcia,*
589 U.S. 191 (2020) ...................................... 4, 15, 28, 29, 30, 32, 34, 35, 36

*Keller v. State Bar,*
496 U.S. 1 (1990).......................................................................................46

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .......................................................................13, 18, 19

*League of Women Voters v. Sec'y of State, Fla.,*
   66 F.4th 905 (11th Cir. 2023) ........................................................51

*Mayor of City of New York v. Miln,*
   36 U.S. (11 Pet.) 102 (1837).................................................... 4, 32

*McCoy v. Hernandez,*
   203 F.3d 371 (5th Cir. 2000) .......................................................46

*McDonald's Corp. v. Robertson,*
   147 F.3d 1301 (11th Cir. 1998) ....................................................11

*Medina v. Planned Parenthood S. Atl.,*
   No. 23-1275 (U.S. June 26, 2025)...........................................25, 26

*Merrion v. Jicarilla Apache Tribe,*
   455 U.S. 130 (1982) ......................................................................37

*Mich. Corr. Org. v. Mich. Dep't of Corr.,*
   774 F.3d 895 (6th Cir. 2014) .......................................................27

*Morgan v. Gertz,*
   166 F.3d 1307 (10th Cir. 1999) ...................................................46

*Murthy v. Missouri,*
   603 U.S. 43 (2024)........................................................................21

*Myers v. Gilman Paper Corp.,*
   544 F.2d 837 (5th Cir. 1977) ................................................. 17, 51

*N.Y. State Dep't of Soc. Servs. v. Dublino,*
   413 U.S. 405 (1973) ......................................................................30

*Nationwide Mut. Ins. Co. v. Darden,*
   503 U.S. 318 (1992) ......................................................................40

*Nat'l Coal. of Latino Clergy, Inc. v. Henry,*
   No. 07-CV-613, 2007 WL 4390650 (N.D. Okla. Dec. 12, 2007)...............................38

*Nat'l Pork Producers Council v. Ross,*
   598 U.S. 356 (2023) ..........................................................16, 36, 37

*Nigro v. United States,*
    117 F.2d 624 (8th Cir. 1941) ...................................................................47

*Nken v. Holder,*
    556 U.S. 418 (2009) ...........................................................................11

*Pedreira v. Sunrise Children's Servs., Inc.,*
    802 F.3d 865 (6th Cir. 2015) ...................................................................51

*PlayNation Play Sys., Inc. v. Velex Corp.,*
    939 F.3d 1205 (11th Cir. 2019) .................................................................51

*Plyler v. Doe,*
    457 U.S. 202 (1982) ......................................................................... 4, 12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,*
    324 U.S. 806 (1945) ...........................................................................38

*Rosemond v. United States,*
    572 U.S. 65 (2014).............................................................................47

*Safe Sts. All. v. Hickenlooper,*
    859 F.3d 865 (10th Cir. 2017) ...............................................................25, 26

*Schneidewind v. ANR Pipeline Co.,*
    485 U.S. 293 (1988) ...........................................................................33

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ...........................................................................25

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996)............................................................................23

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) .................................................................11

*State v. Spradlin,*
    12 S.W.3d 432 (Tenn. 2000)...................................................................42

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ...........................................................................18

*Support Working Animals v. Governor of Fla.*,
8 F.4th 1198 (11th Cir. 2021) ...................................................18, 20, 43

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ................................................................... 39, 45

*Terrace v. Thompson*,
263 U.S. 197 (1923) ...........................................................................32

*Terry v. Ohio*,
392 U.S. 1 (1968) ...............................................................................48

*Tierney v. Davidson*,
133 F.3d 189 (2d Cir. 1998) ............................................................46

*Truax v. Raich*,
239 U.S. 33 (1915) .............................................................................32

*Trump v. CASA, Inc.*,
No. 24A884 (U.S. June 27, 2025) .............................................16, 37, 43

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ...........................................................................50

*United States v. Coats*,
8 F.4th 1228 (11th Cir. 2021) ..........................................................47

*United States v. Hansen*,
599 U.S. 762 (2023) ...........................................................................14

*United States v. Jimenez-Shilon*,
34 F.4th 1042 (11th Cir. 2022) ........................................................32

*United States v. Robinson*,
83 F.4th 868 (11th Cir. 2023) .................................. 39, 40, 44, 45, 47, 48

*United States v. Salerno*,
481 U.S. 739 (1987) ..............................................................5, 28, 33

*United States v. Texas*,
97 F.4th 268 (5th Cir. 2024) ......................................................27, 37, 38

*Va. Off. for Prot. & Advoc. v. Stewart*,
563 U.S. 247 (2011) ....................................................24, 49

*Valdes v. State*,
728 So. 2d 736 (Fla. 1999) ...........................................45

*Virginia v. Hicks*,
539 U.S. 113 (2003) ......................................................37

*Washington v. Dewey*,
433 F. Supp. 3d 334 (D. Conn. 2020) ..........................46

*Wilson v. Attaway*,
757 F.2d 1227 (11th Cir. 1985) ....................................46

*Wilson v. State Bar of Ga.*,
132 F.3d 1422 (11th Cir. 1998) ....................................18

**Statutory and Constitutional Provisions**

8 U.S.C. § 1103 ...............................................................24

8 U.S.C. § 1225 ...............................................................12

8 U.S.C. §§ 1301-06 ........................................................30

8 U.S.C. § 1304 ...............................................................30

8 U.S.C. § 1324 ......................12, 20, 24, 31, 32, 35, 36, 37

8 U.S.C. § 1324a ....................................................... 12, 20

8 U.S.C. § 1325 .................................... 4, 7, 12, 30, 37

8 U.S.C. § 1326 .......................................4, 8, 24, 30

8 U.S.C. § 1329 ...............................................................24

8 U.S.C. § 1357 ...............................................................34

8 U.S.C. § 1601 ...............................................................12

18 U.S.C. § 1961 .............................................................24

18 U.S.C. § 1962 ...............................................................................................24

18 U.S.C. § 1964 ...............................................................................................24

Fla. Const. art. IV, § 4......................................................................................20, 41

Fla. Const. art. V, § 17 .....................................................................................41

Fla. Const. art. VIII, § 1 ...................................................................................41

Fla. Stat. § 16.01 ..............................................................................................41

Fla. Stat. § 16.56 ..............................................................................................20

Fla. Stat. § 20.201 ............................................................................................43

Fla. Stat. § 20.24 ..............................................................................................43

Fla. Stat. §§ 27.02-.13, 27.18-.25 ....................................................................41

Fla. Stat. § 27.18 ..............................................................................................41

Fla. Stat. § 30.15 ..............................................................................................41

Fla. Stat. § 30.49 ..............................................................................................41

Fla. Stat. § 321.05 ............................................................................................41

Fla. Stat. § 322.03 ............................................................................................20

Fla. Stat. § 448.095 ..........................................................................................20

Fla. Stat. § 811.102 ...............................................................4, 7, 8, 13, 21, 33

Fla. Stat. § 811.103 .....................................................................4, 8, 13, 21

Fla. Stat. § 908.111 ..........................................................................................7

Fla. Stat. § 910.03 ......................................................................................13, 20

Fla. Stat. § 943.04 ............................................................................................41

Fla. Stat. § 943.10 ............................................................................................45

**Rules**

Fed. R. Civ. P. 65 .................................................................17, 39, 40, 43, 47

**Other Authorities**

1983 Fla. Op. Att'y Gen. 253 (1983) ................................................................45

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) .............................32

Allison Brownell Tirres, *Ownership Without Citizenship: The Creation of Noncitizen Property Rights*, 19 Mich. J. Race & L. 1 (2013) ...........................................32

Anthony Talcott, *Florida sees record-high illegal immigration. Here's how it affects your wallet*, ClickOrlando (Aug. 20, 2024) .................................................6

*Caleb Nelson, "Standing" and Remedial Rights in Administrative Law*, 105 Va. L. Rev. 703 (2019) .................................................27

City of Miami Charter .................................................................41

DEA, *Facts About Fentanyl* .................................................................6

Dep't of Homeland Security, *Fact Sheet: DHS Shows Results in the Fight to Dismantle Cartels and Stop Fentanyl from Entering the U.S.* (July 31, 2024).................................6

Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration on Florida* (2023).................................................7

*Memorandum of Agreement*, ICE.................................................................35

Office of Attorney General James Uthmeier, *VIDEO: AG Moody and FDLE Announce Third Straight Decrease in Statewide Drug Deaths* (July 9, 2024) .........................................7

Restatement (Third) of Agency (Am. L. Inst. 2006) .................................. 40, 42

The White House, *Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border* (Jan. 22, 2025) .................................................6

The White House, *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024).................................................6

U.S. Customs and Border Protection, *Southwest Land Border Encounters* ..........................6

USA Facts, *Are fentanyl overdose deaths rising in the US?* ..........................................................7

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. But the district court lacked jurisdiction under Article III because Plaintiffs lack standing. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

# ISSUES PRESENTED

The State of Florida enacted SB 4-C to combat illegal immigration and to quell the rush of fentanyl trafficking and gang violence that accompanies it. And Florida intentionally crafted SB 4-C to avoid any conflict with federal law, instead using federal definitions and incorporating federal defenses into the statute. Even so, the district court granted a preliminary injunction against both the named Defendants and non-party law-enforcement officers. It found that Plaintiffs were likely to succeed in their claims that federal law preempts SB 4-C and that Florida's law violates the Dormant Commerce Clause. The issues on appeal are:

1.  Whether Plaintiffs are likely to show that they have standing.

2.  Whether Plaintiffs are likely to show that they have a cause of action to enforce federal immigration law.

3.  Whether Plaintiffs are likely to show that SB 4-C is (i) facially field preempted for directly operating in the field of alien entry into and removal from the country or for directly operating in the supposedly federal field of alien movement or presence; (ii) facially conflict preempted for interfering with the federal government's prosecutorial discretion to enforce the federal entry and reentry crimes; or (iii) facially violative of the Dormant Commerce Clause.

4.  Whether Plaintiffs have clearly established that the balance of the equities favors an injunction and that the public interest favors an injunction.

5.      Whether any injunction may permissibly bind non-party law-enforcement officers.

## INTRODUCTION

"From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). Even in the immigration context, "the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (cleaned up). As a result, States are not without "power to deter the influx of persons entering the United States against federal law," *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982), just as at the Founding, *Mayor of City of New York v. Miln*, 36 U.S. (11 Pet.) 102, 132-33 (1837). When Congress "prescribe[s] what it believes to be appropriate standards for the treatment of [aliens], the States may, of course, follow the federal direction." *Plyler*, 457 U.S. at 219 n.19.

Florida did nothing more in enacting SB 4-C. To aid the United States in curbing illegal immigration within the State's borders, SB 4-C criminalizes the entry into Florida of those who have illegally entered the United States. Fla. Stat. §§ 811.102, 811.103. That law tracks federal law to a tee. *See* 8 U.S.C. §§ 1325(a), 1326(a). It also retains federal-law defenses and says nothing of who should be admitted or removed from the country. As Justice Scalia observed, Florida "has moved to protect its sovereignty—not in contradiction of federal law, but in complete compliance with it." *Arizona*, 567 U.S. at 437 (Scalia, J., concurring in part, dissenting in part). "If securing its territory in this fashion is not within the power of [Florida], we should cease referring to it as a sovereign State." *Id.*

Despite those principles, the district court preliminarily enjoined Defendants from enforcing SB 4-C. That was error. At the gate, Plaintiffs lack standing and a cause of action to enforce federal immigration law. On the merits, they are wrong that federal law preempts SB 4-C or that Florida's law violates the Dormant Commerce Clause. Federal immigration law supplants neither the State's power to assist federal immigration enforcement nor "the defining characteristic of [its] sovereignty: the power to exclude from the sovereign's territory people who have no right to be there." *Id.* at 417. Nor does excluding illegal aliens implicate the Dormant Commerce Clause, for SB 4-C has nothing to do with economic protectionism against sister States. Those difficulties for Plaintiffs' case are compounded by Plaintiffs' failure to prove their facial challenge—"the most difficult challenge to mount"—because they cannot show that "no set of circumstances exists under which the Act" would comply with federal law. *United States v. Salerno*, 481 U.S. 739, 745 (1987). And in all events, the district court's order wrongly binds all of Florida's law-enforcement officers—who are not parties, not the parties' agents, and not acting in concert with the parties—flouting longstanding equitable principles entitling every litigant to "their day in court." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (Hand, J.).

The Court should vacate that injunction. At minimum, it should narrow the injunction to the extent it applies to non-party law enforcement.

## STATEMENT OF THE CASE

### A.    The Crisis at the Southern Border

As Presidents of both parties have agreed, the situation at America's border with Mexico is nothing short of a national "crisis."[1] Border Patrol consistently encounters around 2 million illegal immigrants a year who evade authorities at the border, and those are merely the individuals Border Patrol has apprehended.[2] In fiscal year 2024 alone, Border Patrol seized enough fentanyl to kill every single American several times over—27,000 pounds.[3] The epidemic of illegal immigration reverberates throughout the Nation, including in Florida, which saw record levels of illegal immigration in 2024.[4] That population strains the State fiscally to the tune of over $8 billion each year, leading to

---

[1] The White House, *Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border* (Jan. 22, 2025), https://tinyurl.com/yr3j33he; The White House, *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024), https://tinyurl.com/33znys4z.

[2] U.S. Customs and Border Protection, *Southwest Land Border Encounters* (last visited June 9, 2025), https://tinyurl.com/mwnx26f8.

[3] Dep't of Homeland Security, *Fact Sheet: DHS Shows Results in the Fight to Dismantle Cartels and Stop Fentanyl from Entering the U.S.* (July 31, 2024), https://tinyurl.com/bf65z7n2; *see also* DEA, *Facts About Fentanyl* (last visited June 9, 2025), https://tinyurl.com/mte3r9px (explaining that 2 milligrams of fentanyl is a fatal dose for an average American).

[4] Anthony Talcott, *Florida sees record-high illegal immigration. Here's how it affects your wallet*, ClickOrlando (Aug. 20, 2024), https://tinyurl.com/3y5bpvxa.

Florida spending $4 billion more on education and $1.6 million more on criminal law enforcement, each Floridian fronting an estimated bill of $5,000 on those effects.[5]

The costs for Floridians are more than simply economic, as those effects have also cost many their lives—the flooding of fentanyl into the State, again largely fueled by the border crisis, killed 5,083 Floridians in 2022, the second-highest of any state in the Nation.[6] Florida led the Nation with 2,089 fentanyl-seizure operations in 2023.[7]

### B.    SB 4-C

In the wake of those concerns, Florida passed SB 4-C in 2025. Fla. Laws ch. 2025-2. That law created two new crimes. The first provision (the entry provision) bars "unauthorized alien[s]" from "knowingly enter[ing]" Florida "after entering the United States by eluding or avoiding examination or inspection by immigration officers." Fla. Stat. § 811.102(1). That conforms to federal law, which criminalizes entry by evading inspection. 8 U.S.C. § 1325(a). Florida law defines an "unauthorized alien" as "a person who is unlawfully present in the United States according to the terms of the federal Immigration and Nationality Act" and federal regulations. Fla. Stat. § 908.111(1)(d). SB

---

[5] *See* Federation for American Immigration Reform, *The Fiscal Burden of Illegal Immigration on Florida* (2023) https://tinyurl.com/2p9h7f8v.

[6] USA Facts, *Are fentanyl overdose deaths rising in the US?* (last updated Sept. 27, 2023), https://tinyurl.com/mvus7kff.

[7] Office of Attorney General James Uthmeier, *VIDEO: AG Moody and FDLE Announce Third Straight Decrease in Statewide Drug Deaths* (July 9, 2024), https://tinyurl.com/yc7edrft.

4-C provides that entry is not a crime if "[t]he Federal Government has granted the unauthorized alien lawful presence in the United States or discretionary relief that authorizes the unauthorized alien to remain in the United States temporarily or permanently," or if "'[t]he unauthorized alien's entry into the United States did not constitute a violation" of federal law. *Id.* § 811.102(4)(a), (c). Further respecting federal law, state officers must notify federal authorities that they have arrested those unlawfully present aliens. Fla. Stat. § 811.102(7)(a). That provision ensures that federal authorities, if they desire, can provide authorization for that alien to remain.

The second provision (the reentry provision) criminalizes the entry or presence of "unauthorized alien[s]" in Florida where the federal government has "denied admission, excluded, deported, or removed" the alien or where the alien "departed the United States during the time an order of exclusion, deportation, or removal is outstanding." *Id.* § 811.103(1). Again, this provision follows federal law. 8 U.S.C. § 1326(a). And Florida provides, just as federal law does, that an alien does not violate the reentry provision where the alien has express permission to enter from the United States Attorney General or where such permission was not required under federal law. Fla. Stat. § 811.103(1)(a)-(b); 8 U.S.C. § 1326(a)(2).

## C.    Procedural History

Plaintiffs sued to enjoin SB 4-C. DE1. They include two anonymous individuals and two organizations who claim to be affected by SB 4-C. DE1 ¶¶ 8-29. Plaintiffs YM and VV both allege to have "entered the United States without inspection" some years

ago and currently reside in Florida. DE4-5 ¶¶ 2, 5; DE4-4 ¶¶ 2, 5-6. YM has "applied for a U visa," but the federal government has not yet resolved her application. DE4-5 ¶ 6. VV has reentered the United States after deportation, and she has not sought "to adjust [her] status" since. DE4-4 ¶¶ 5-7. Both Plaintiffs allege some vague desire to leave Florida and return: YM "generally leave[s] Florida for family vacation approximately twice a year" and "plan[s] to continue this travel going forward," DE4-5 ¶ 7, and VV "traveled to New Jersey during harvesting season to pick blueberries" and wants "to do so again during the next season," DE4-4 ¶ 8.

Plaintiffs Florida Immigrant Coalition (FIC) and the Farmworker Association of Florida are nonprofit organizations headquartered in Florida. DE1 ¶¶ 8, 17. FIC has individual and organizational members (including the Farmworker Association and YM). DE4-3 ¶¶ 15, 18. The Farmworker Association has individual members, including VV. DE4-2 ¶ 21. It also has a member, WA, who is not a plaintiff but who claims to have "entered the United States without inspection" and to "generally travel[] outside of Florida on occasion for holidays." DE4-2 ¶ 20.

Plaintiffs sued Florida's Attorney General, the statewide prosecutor, and Florida's 20 state attorneys, but no law-enforcement officers. DE1. They also sought to certify a class. DE5.

Plaintiffs contended that SB 4-C is preempted by federal law and violates the Dormant Commerce Clause. DE1 ¶ 68-77. They moved for a temporary restraining order and a preliminary injunction, DE4, and the district court granted the restraining

9

order *ex parte* the next day, DE28. The court stated that its order "prohibit[ed] Defendants and their officers, agents, employees, attorneys, and any person who [is] in active concert or participation with them from enforcing SB 4-C." DE28 at 14. After learning of arrests by law-enforcement officers, DE50 at 6:5-18, the district court clarified that its TRO also covered any "law enforcement officer with power to enforce SB 4-C," DE49 at 1.

The district court later granted a preliminary injunction. DE67. It held that SB 4-C was field and conflict preempted, and violated the Dormant Commerce Clause. *Id.* at 14. It extended its order once again to all law-enforcement officers. *Id.* at 48.[8]

Defendants appealed. DE68. Defendants moved for a stay of the injunction in the district court, DE69, and then in this Court when the district court delayed in ruling on that motion, Mot. for Stay Pending Appeal, ECF No. 6. A motions panel of this Court denied a stay.

In that order, the panel determined that the Attorney General had not made the "strong showing" required for a stay. Order, ECF No. 24-1 at 5 (Order). It found that

---

[8] The district court held the Attorney General in civil contempt for violating its order to provide notice of its injunction to law-enforcement officers. DE96 at 26. The Attorney General complied by writing a letter to law enforcement, along with a copy of the district court's order, in which he explained his legal position that the injunction's breadth violated Rule 65. Then, the Attorney General wrote another letter to law enforcement when he filed a supplemental brief on the lawfulness of the injunction's scope. The district court believed that the second letter, by reiterating the Attorney General's legal position, "vitiated" the initial notice. *Id.* at 14.

Plaintiffs likely had standing and a cause of action. Order 6-8. The panel conceded the preemption issue was a "closer" question, Order 8, but ultimately found that federal immigration law likely preempted "the field of alien entry into and presence in the United States." Order 8-9. The panel then ducked the question of whether non-party law-enforcement officers could be bound under Federal Rule of Civil Procedure 65. Order 9.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits; (2) a substantial risk of irreparable injury absent injunctive relief; (3) an injunction would not cause substantial harm to other interested persons; and (4) the public interest favors an injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although the first two factors are "the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites," *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (cleaned up). Thus, "[f]ailure to show any of the four factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

This Court reviews the district court's decision to grant or deny "a preliminary injunction for abuse of discretion," reviewing factual findings "for clear error and legal conclusions *de novo.*" *Barber v. Gov. of Ala.*, 73 F.4th 1306, 1316 (11th Cir. 2023).

# SUMMARY OF ARGUMENT

Plaintiffs challenge, as unconstitutional and preempted by federal law, Florida's attempt in SB 4-C to assist the federal government in its statutory mission to deter illegal immigration.[9] Ignoring the "discernible impact on traditional state concerns" from "the influx of persons entering the United States against federal law," *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982), the district court held SB 4-C preempted and unconstitutional. The district court therefore granted Plaintiffs' request for a preliminary injunction preventing any enforcement of the statute. It did so despite Plaintiffs' lack of standing, lack of a cause of action, and failure to show that Florida's law is inconsistent with the federal immigration regime or that it promotes economic protectionism against sister States. And though Florida's law-enforcement officers were not parties or controlled by the parties, the district court purported to bind all law-enforcement officers who have power to enforce SB 4-C. This Court should vacate that injunction and reverse.

**I.** Plaintiffs are unlikely to succeed on the merits of their claims.

**A.** Plaintiffs lack standing. The individual Plaintiffs (YM and VV) and a non-party (WA) failed to plead sufficient facts to support their standing. Their declarations

---

[9] *See, e.g.*, 8 U.S.C. § 1325(a) (criminalizing unlawful entry); *id.* § 1324(a)(1)(A) (criminalizing smuggling of unauthorized aliens); *id.* § 1225(b)(2) (providing that inadmissible aliens "shall be detained" pending completion of removal proceedings); *id.* § 1324a(a)(1)(A) (making it unlawful to knowingly hire illegal aliens); *id.* § 1601(6) ("It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.").

lack the needed clarity to establish an imminent violation of SB 4-C, and they also lack a "legally protected interest" in furthering their illegal activity, whether it be hiding their presence from federal authorities or driving without a license or working without authorization. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Nor have they shown standing to sue the statewide prosecutor, given his limited prosecutorial jurisdiction.

A similar failure dooms their standing to sue the state attorneys. The state attorneys, by law, can prosecute only in their circuit, and Plaintiffs' declarations never reveal where their potential crimes would take place. *See* Fla. Stat. § 910.03. The sole exception is VV, who might be able to show—if she can surmount the other standing problems—that one state attorney could prosecute her for her presence in one judicial circuit under Florida's reentry provision. *See* Fla. Stat. § 811.103(1). But that only confirms she cannot sue the other state attorneys and she cannot challenge Florida's entry provision. *See* Fla. Stat. § 811.102(1).

The organizational Plaintiffs similarly lack standing. Those organizations rely on the standing of their identified members (YM, VV, and WA) who have not demonstrated their own standing. To the extent those organizations rely alternatively on a diversion-of-resources theory, those organizations plead far from sufficient facts to demonstrate how and why they are diverting resources.

**B.** Plaintiffs lack a cause of action to enforce federal immigration law. A cause of action is a critical piece to the litigation puzzle, and Congress controls whether plaintiffs can sue to enforce a statute. When the "fairest reading" of a federal statute shows

that Congress wanted to preclude private enforcement of that statute, courts cannot dodge that limitation by pointing to historic notions of equity. That is the case here. The relevant portions of the Immigration and Nationality Act (INA) vest enforcement solely in the U.S. Attorneys. The background of criminal and immigration law, areas that governments have traditionally regulated, bolsters that conclusion. All the more for organizational Plaintiffs who seek to raise the causes of action of third parties, when courts have historically reserved equitable causes of action for those raising a legal defense to an enforcement proceeding preemptively.

**C.** On the merits, SB 4-C is not facially preempted. The district court held that SB 4-C acts in a preempted field and conflicts with federal objectives in the INA. Yet Plaintiffs cannot overcome the presumption against preemption, which "has greatest force when Congress legislates in an area traditionally governed by the States' police powers," as here. *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014). Beyond that weighty presumption, Plaintiffs for their facial claim must also prove that "*no set of circumstances* exists under which the [statute] would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023). They have not come close.

First, SB 4-C does not act in a preempted field. The district court claimed that SB 4-C operates in the field of regulating alien movement inside the country. But the INA offers no evidence that Congress shared Plaintiffs' restrictive vision of state authority. Congress criminalized similar behavior through its illegal entry and reentry statutes, as the district court noted. But an "overlap" in criminal prohibitions does not by

itself equal preemption. *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). Nor do the unique foreign-affairs interests at play in the federal alien-registration regime in *Arizona v. United States*, 567 U.S. 387 (2012), map on here. If anything, the history of state regulation of aliens and the presumption against preemption cut the other way.

As for the separate fields of alien entry and removal, Florida's law does not operate in those fields. It says nothing about who can enter, how they can enter, or who gets removed from the country. SB 4-C lets federal authorities call those shots. It also does not operate in the field of alien transportation because it does not criminalize transportation of aliens, so this Court's opinion in *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1266 (11th Cir. 2012), is not on point.

Second, SB 4-C is not conflict preempted. The district court relied heavily on the prosecutorial discretion inherent in federal entry and reentry crimes. It envisioned that federal prosecutors might decline to prosecute, and so a separate enforcement scheme with separate remedies threatens that discretion. But that discretion arises in the very nature of every prosecution, and an "overlap" in state and federal criminal law—once again—"does not even begin to make a case for conflict preemption." *Garcia*, 589 U.S. at 211. Nothing in the INA suggests that the discretion to prosecute federal entry and reentry crimes is special in a preemptive way. Nor has there been any evidence that prosecution under Florida's law would conflict in *every* instance with that discretion, even if it were preemptive. *Ga. Latino*, 691 F.3d at 1266.

**D.** SB 4-C does not violate the Dormant Commerce Clause. That doctrine invalidates state attempts to wage economic warfare with one another. The Supreme Court has repeatedly defined economic discrimination as "measures [purposefully] designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). SB 4-C accomplishes nothing of that sort. *Edwards v. California*, 314 U.S. 160 (1941), does not hold otherwise or hold, as the district court thought, that States are per se precluded from regulating the crossing of state borders by any individuals in all instances. That case involved just another instance of economic discrimination aimed at protecting state coffers from out-of-state residents. *Id.* at 174.

**II.** Plaintiffs have also failed to meet the remaining requirements for preliminary injunctive relief. Any harm done to Plaintiffs is outweighed by the harm done to the State of Florida and the public interest from the "State [being] enjoined by a court from effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, No. 24A884, slip op. at 25 (U.S. June 27, 2025) (quotations omitted). The balance of the equities strongly favors the State's ability to protect its citizens. More fundamentally, Plaintiffs arrive at this Court with unclean hands, seeking to protect their federal and state crimes unrelated to the law they challenge here. The Court should give no equitable quarter to that inequitable conduct.

**III.** Plaintiffs are not likely to succeed in showing that the district court had the authority to bind all Florida law-enforcement officers.

**A.** Even if injunctive relief were appropriate, there are limits to that power. By binding all law-enforcement officers in Florida, the district court transgressed the limits baked into Rule 65 by history. Rule 65 sets out three narrow categories of persons that district courts can bind with their injunctions: the parties, the parties' agents, and those in "active concert or participation with" the parties and their agents. Fed. R. Civ. P. 65(d)(2). Those categories represent two intertwined legal traditions as old as America itself: that each litigant is entitled to "have their day in court," *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (Hand, J.), and that, unlike a legislature, a federal court's limited power permits it not to "enjoin the world at large" nor "to declare conduct unlawful," *id.* Defendants here are Florida's various prosecutors, but law-enforcement officers are not parties, not Defendants' agents, and are not in "active concert or participation with" Defendants for every enforcement action. Fed. R. Civ. P. 65(d)(2).

**B.** The motions panel determined that if the district court was wrong to bind law enforcement, the Attorney General would lack appellate standing. But appellate standing does not work that way—it operates on a judgment level, not an issue level. *Myers v. Gilman Paper Corp.*, 544 F.2d 837, 847 (5th Cir. 1977). Even if appellate standing were evaluated issue-by-issue, the Attorney General is aggrieved by an order binding law enforcement by making him potentially liable for their actions.

**ARGUMENT**

**I.   PLAINTIFFS HAVE FAILED TO SHOW THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS.**

### A.   Plaintiffs lack standing to attack SB 4-C.

To have standing under Article III, plaintiffs must show injury in fact, traceability, and redressability. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The injury must be "concrete and particularized" and "actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). For there to be traceability and redressability to a particular defendant, a plaintiff "must show, at the very least, that the [specific] official has the authority to enforce the particular provision that [the plaintiff] has challenged." *Support Working Animals v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). Plaintiffs have cleared none of those hurdles.

### 1.   The unnamed, individual Plaintiffs lack standing.

Both individual Plaintiffs lack standing. So does WA who, though not a plaintiff, is a member of the Farmworker Association by which the organizations hope to establish standing. DE4-2 ¶ 20 (the Farmworker Association's declaration relying on injuries to WA); DE4-3 ¶ 18 (FIC's declaration relying on the Farmworker Association to establish its standing).

To start, a plaintiff lacks an injury if he fails to allege that he is presently engaging, or will imminently engage, in conduct that violates the challenged statute. *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428-29 (11th Cir. 1998); *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 564 (1992). None of the individuals identified by Plaintiffs meets that bar. WA, YM, and VV offer "merely speculative" travel wishes without any "concrete plans" to exit or enter Florida. *Lujan*, 504 U.S. at 561, 564; *see also* DE4-2 ¶ 20 (WA alleging that "[s]he generally travels outside of Florida on occasion for holidays, including Christmas and spring break"); DE4-5 ¶ 7 (YM alleging that she "generally leave[s] Florida for family vacation approximately twice a year," and, at some unspecified future time, "plan[s] to continue this travel"); DE4-4 ¶ 8 (VV alleging that she "ha[s] traveled to New Jersey during harvesting season to pick blueberries" and "intend[s] to do so again during the next season" without giving any more details). And Plaintiffs offer nowhere near enough facts to show that they fall outside of SB 4-C's statutory defenses. DE4-2 ¶ 20 (providing only that WA "entered the United States without inspection in 2003," and saying nothing about her status with the federal government). They have thus failed to show that they are engaging, or will soon engage, in conducted proscribed by SB 4-C.

Next, a plaintiff lacks injury if he has no "legally protected interest" in the conduct he seeks to vindicate. *Lujan*, 504 U.S. at 560. A plaintiff who complains "that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (finding that asylum-seekers did not have standing to assert a right to cross the border illegally). Here, each individual seeks to vindicate their ability to

engage in unrelated illegal conduct: whether it be driving without a license, working without legal authorization, or obtaining transportation in violation of federal and state law. DE4-4 ¶¶ 8-9 (VV seeks to work without authorization); DE4-5 ¶ 7 (YM seeks to travel out of state at an unspecified time); DE4-2 ¶ 20 (WA seeks to travel out of state at some unspecified future time). But this conduct violates laws that Plaintiffs do not challenge, so it is not legally protected. Fla. Stat. § 322.03 (making driving without a license a crime); 8 U.S.C. § 1324a(a) (making working without authorization unlawful); Fla. Stat. § 448.095 (similar); 8 U.S.C. § 1324(a)(1)(A) (barring knowing or reckless transportation of aliens).

Plaintiffs also lack standing to sue the statewide prosecutor and thus the Attorney General. *See* Fla. Const. art. IV, § 4(b). To prosecute, the statewide prosecutor needs a qualifying crime that occurred "in two or more judicial circuits as part of a related transaction" or was "connected with an organized criminal conspiracy affecting two or more judicial circuits." Fla. Stat. § 16.56(1)(a). Plaintiffs never made that showing.

Finally, Plaintiffs at least lack standing to sue the state attorneys *collectively*, given that state attorneys may only prosecute individuals for crimes committed in their territorial jurisdiction. *See* Fla. Stat. § 910.03; *see also Support Working Animals*, 8 F.4th at 1201 (traceability and redressability require a showing that the "official [sued] has the authority to enforce the particular provision that [the plaintiff] has challenged"). Plaintiffs have certainly not alleged that they plan to violate Florida law in *every* Florida circuit. Nor does it matter that Plaintiffs seek to represent a statewide class. Any class action would

exclude relief against state attorneys where standing has not been demonstrated. *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("A named plaintiff in a class action" must also establish standing like any other plaintiff.); *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) ("[P]laintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek[.]"). The motions panel glossed over that fact and treated Defendants as a monolith, finding that there was a likelihood of standing because "police in Florida have apparently already made arrests under SB 4-C." Order 6. That was wrong.

Plaintiffs' declarations are far too unclear about which state attorneys could prosecute them. For YM, she has never been deported or excluded before, so she can only be prosecuted under the entry provision by the state attorney where she "enters" Florida. *See* Fla. Stat. §§ 811.102(1), 811.103(1). That is, the state attorney in the county at the Florida border where YM returns might have jurisdiction to prosecute her. But YM has never shown concrete plans about where she will enter.

As for VV, she similarly lacks detailed plans for her entry back into Florida. She thus lacks standing to challenge the entry provision. But because VV has been deported, she could (potentially) be prosecuted under the reentry provision for her presence in Immokalee, Florida. *See* Fla. Stat. § 811.103(1); DE4-4 ¶ 5. The only state attorney who could prosecute her for that crime, however, is Amira Fox, because VV never alleges concrete plans to travel anywhere else in Florida. *See generally* DE4-4.

## 2. The organizational Plaintiffs lack standing.

An organization may show standing through either associational standing (injury to its members) or organizational standing (injury to itself). *See City of South Miami v. Governor of Fla.*, 65 F.4th 631, 637 (11th Cir. 2023). Neither works for FIC or the Farmworker Association.

As for associational standing, FIC and the Farmworker Association cannot show that any of their members "would otherwise have standing to sue in their own right." *Jacobson*, 974 F.3d at 1249. None of the individuals identified—YM, VV, or WA—have standing for the reasons outlined above. And while FIC claims the Farmworker Association as one of its members with standing, the Farmworker Association itself has not shown associational standing or, as explained next, organizational standing.

Nor can the organizations rely on organizational standing through a diversion-of-resources theory. The Farmworker Association has disclaimed that it would have to divert resources. DE45 at 3 n.6. FIC says that its organizational members will be forced "to divert significant resources from existing programs," DE4-3 ¶ 20, but never explains or provides details about how SB 4-C will cause diversions, *City of South Miami*, 65 F.4th at 639 (an organization cannot "spend its way into standing"), or how any injury is "closely connected to the diversion," *id.* at 638-39. FIC must show "what harm [its members are] seeking to counteract and how [any] diversion of resources is aimed" at preventing that harm. *Cousins v. Sch. Bd. of Orange Cnty.*, 687 F. Supp. 3d 1251, 1270 (M.D. Fla. 2023). But FIC identifies no steps that its members are taking to counteract

SB 4-C, nor how those steps ameliorate any alleged harms. *See id.* (noting that the plaintiff failed "to show any logical connection between" the diversion of resources and "combating the alleged injuries").

### B. Plaintiffs lack a cause of action to enforce federal immigration law.

1. Plaintiffs have no "cause of action" to enforce the INA. *Davis v. Passman*, 442 U.S. 228, 239 (1979). They rely solely on an equitable cause of action, DE1 at 13-14, which fails because the "fairest reading" of the INA shows that "Congress [has] displace[d]" "equitable relief." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328-29 (2015). Plaintiffs "cannot, by invoking [courts'] equitable powers, circumvent" that statutory limit. *Id.*[10]

The INA's text bears that out. In that statute, Congress established a reticulated enforcement scheme for use by particular federal officers. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) (where Congress created a "detailed remedial scheme," federal courts "should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*"). The statute charges the Secretary of Homeland Security "with the administration and enforcement" of the INA unless another part "relate[s] to the powers, functions, and duties conferred upon"

---

[10] The panel rewrote that standard by focusing on two textual clues that the Supreme Court in *Armstrong* used to find that the "fairest reading" of one federal statute precluded private enforcement. Order 7. But the *Armstrong* Court treated those indicia of statutory meaning as just that, and not as a checklist of requirements before a cause of action may be precluded. 575 U.S. at 328.

other Executive Branch officers. 8 U.S.C. § 1103(a)(1). Some examples of carveouts are the federal bars on illegal entry and reentry, which provide for enforcement by specified federal officers—criminal and civil suits by a U.S. Attorney. 8 U.S.C. § 1329 (vesting enforcement in the U.S. Attorney for suits under "this subchapter"); *see* 8 U.S.C. §§ 1324, 1326, 1330(a) (providing that "fine[s], penalt[ies] or expenses imposed or incurred" under several sections of Subchapter II may be "recovered by civil suit, in the name of the United States"). Because federal law "expressly confers enforcement authority on" specific federal officers, it "preclud[es] enforcement by" private plaintiffs. *Corey v. Rockdale Cnty.*, 689 F. Supp. 3d 1251, 1263 (N.D. Ga. 2023), *vacated as moot,* No. 23-13097, 2025 WL 1325325 (11th Cir. May 7, 2025).[11]

That statutory bar is even clearer given the background principles of criminal and immigration law, where private rights and interests are at their nadir. *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 261 & n.8 (2011) (providing that *Ex parte Young* claims "cannot occur unless the" plaintiff "has been given a federal right of" his or her "own to vindicate . . . under the . . . statute"). After all, prosecution is a "core executive

---

[11] Congress also provided for limited private enforcement of certain criminal provisions of the INA through the Racketeering Influence and Corrupt Organizations (RICO) Act. Under RICO, a private party may sue to recover damages for transportation and harboring offenses in the INA. 18 U.S.C. §§ 1961(1)(F), 1962, 1964(c). "Congress's decision to create a limited private cause of action" only further solidifies "that the omission of a general private right of action in the [INA] should . . . be understood as intentional." *Coal. for Competitive Elec., Dynegy, Inc. v. Zibelman*, 272 F. Supp. 3d 554, 565 (S.D.N.Y. 2017) (quotation omitted).

power," *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 209 (2020); *see also Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 902-05 (10th Cir. 2017) (rejecting preemption challenge to Colorado's marijuana laws under the Controlled Substances Act), and "let[ting] private plaintiffs enforce [a federal statute] poses delicate questions of public policy" that "only Congress may answer," *Medina v. Planned Parenthood S. Atl.*, No. 23-1275, slip op. at 7, 24 (U.S. June 26, 2025).[12] "No case during the last generation creates a private right of action to enforce a statute cast in the form of a criminal prohibition[.]" *Isr. Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*, 16 F.3d 198, 200-01 (7th Cir. 1994). Immigration law only reinforces that private enforcement is inappropriate. Plaintiffs' whole theory of preemption is that immigration regulation "is exclusively a federal power." DE4 at 7. Though they are wrong that States are entirely excluded from regulating in or near this realm, the "one voice" they propose to elevate would in any event not be theirs to control. *See Arizona v. United States*, 567 U.S. 387, 409-10 (2012). Congress exercised its "broad discretion" and "power over the manner of the[] implementation" of the INA by "leav[ing] the enforcement of federal law to federal actors." *Armstrong*, 575 U.S. at 325-26.

---

[12] In *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, this Court understood the Supremacy Clause to supply a cause of action to enforce the INA, *see* 691 F.3d 1250, 1261 (11th Cir. 2012), but that analysis has been abrogated by *Armstrong*, 575 U.S. at 324-25 ("[T]he Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action." (citation omitted)).

The district court wrongly thought otherwise. It held that Congress displaced Plaintiffs only from prosecuting a person for crimes, not from enforcing implied preemption created by those same provisions. DE67 at 12 n.8. To the court, Plaintiffs "do[] not seek to *enforce* the INA, but seek[] to avoid prosecution under a state law preempted by the INA." *Id.* Yet implied preemption stems from Congress's "clear and manifest purpose" in a statute to displace state law, and enforcing that purpose *is* enforcing the statute's rules. *Arizona*, 567 U.S. at 400.

Nor does the INA grant Plaintiffs privately enforceable, "personal rights." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002). Because "Congress can create new" rights and remedies, that body is the entity best suited to "balancing [the] costs and benefits" of who may enforce a federal statute. *Medina*, slip op. at 24. As a result, a plaintiff suing in equity must come armed with a federal law endowing it with privately enforceable rights, *see Safe Sts. All.*, 859 F.3d at 902-04, bestowed "in clear and unambiguous terms," *Gonzaga*, 536 U.S. at 290. The only right Plaintiffs identify is the right not to be regulated because of preemption, but that is insufficient. For a statute to grant rights, "its text must be phrased in terms of the persons benefited." *Id.* at 284. If anything, the INA restricts Plaintiffs' rights by criminalizing their conduct.

2. The organizational Plaintiffs are even more poorly suited to wield an equitable cause of action. Whether the organizational Plaintiffs may sue in equity depends on whether granting them relief aligns with the relief "traditionally accorded by courts of

equity" at the Founding. *Grupo Mexicano de Desarrollo S.A., v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999).

It does not. As Judge Oldham recently observed, the *Ex parte Young* action is available only to private plaintiffs "to preemptively assert 'in equity . . . a defense that would otherwise have been available in the State's enforcement proceedings at law.'" *United States v. Texas*, 97 F.4th 268, 310 (5th Cir. 2024) (Oldham, J. dissenting); *see also Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) (*Ex parte Young* exists "to raise in equity a defense available at law"). Even if the INA did not displace private enforcement, *Ex parte Young* at most protects an individual who claims that "federal law immunizes him from state regulation." *Armstrong*, 575 U.S. at 326. In other words, it protects only those who are "direct targets of regulation." Caleb Nelson, *"Standing" and Remedial Rights in Administrative Law*, 105 Va. L. Rev. 703, 715 (2019).

FIC and the Farmworker Association are no such plaintiffs. They do not seek to preemptively raise federal preemption as a defense that would otherwise have been available in state enforcement proceedings, or otherwise seek immunity from state regulation, because they are not directly regulated by SB 4-C. That is not to say that these preemption claims cannot be raised: Individual Plaintiffs may do so as a legal defense in a state enforcement proceeding. But the organizational Plaintiffs may not.

**C.    SB 4-C is not facially preempted by federal immigration law.**

The district court held that SB 4-C was field and conflict preempted on its face. DE67 at 15, 22, 25. Neither holding is true.

**1. SB 4-C is not field preempted in all applications.**

Field preemption is—and should be—a "rare case[.]" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). To establish field preemption, Plaintiffs must identify a field fully occupied by federal law. *Id.* And, because Plaintiffs bring a facial challenge, they must also show that SB 4-C operates within that field in every application. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). If any application of SB 4-C is not preempted, Plaintiffs lose. *See id.* They have failed at both steps.

a. Plaintiffs have failed to demonstrate that the movement of illegal aliens is a preempted field. To establish that a field is preempted, Plaintiffs must show that the "clear and manifest purpose of Congress" was a "complete ouster of state power" in that area. *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). That can arise from a "framework of regulation so pervasive" that Congress necessarily "left no room for the States to supplement it," or from a federal interest "so dominant" that the federal system logically "preclude[s] enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (cleaned up). Because field preemption is strong medicine, "the relevant field should be defined narrowly." *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018); *see also Hillsborough Cnty. v. Automated Med. Lab'ys*, Inc., 471 U.S. 707, 718 (1985) (taking narrow view of a field). And even in the arena of immigration, "courts should assume that" Congress has "not superseded" the "historic police powers of the States." *Arizona*, 567 U.S. at 400.

The Supreme Court illustrated those principles in *Kansas v. Garcia*. There, Kansas prosecuted aliens under a state identity-theft statute for their use of fraudulent information on employment forms. 589 U.S. at 198. Invoking federal preemption, the defendants challenged their convictions because federal immigration law bars the use of "any information contained in" a federal Form I-9 "for purposes other than for enforcement of" federal law. *Id.* at 196-97.

The Supreme Court upheld the convictions. By its measure, Kansas's law was not preempted even though the same information that served as the basis for the prosecutions appeared on the aliens' I-9 forms. *Id.* at 210-11. Federal law simply did not occupy the "field of employment verification," *id.*, because nothing "in the text and structure of the [immigration] statute" indicated a congressional intent to oust States from the field, *id.* at 208. Crucially, the Supreme Court adopted a narrow—and faithful—reading of *Arizona*'s field-preemption holding to extend only to "the field of *alien registration*." *Id.* at 210 (emphasis added). Alien registration exemplifies the "rare case[]" for field preemption, *id.* at 208, because federal law "ma[de] a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders," *id.* at 210. Punctuating that holding, that *Garcia* Court clarified that mere "overlap" in state and federal criminal statutes "does not even begin to make a case for conflict preemption." *Id.* at 211.

Against that backdrop, the district court (and motions panel) suggested that the INA preempts the field of any "movement of noncitizens." DE67 at 16; *see also* Order

at 8-9. The INA does not support their sweeping vision of preemption. The district court relied on the supposed "comprehensive" nature of the INA and amorphous federal interests. DE67 at 16-18. But all the district court could cite for that premise was the fact that "[t]he INA defines and prohibits illegal entry and reentry" as well as transport of illegal aliens. *Id.* That Congress has criminalized conduct far from shows that it also foreclosed state laws. *See Garcia*, 589 U.S. at 212. Such a view would unwind countless overlapping state crimes, from prohibitions on manufacturing narcotics to fraud and murder. The district court's ballooned reading of the INA hollows the presumption against preemption.

The district court's analogy to alien registration—the sole field the Supreme Court has held preempted by the INA—was also inapt. DE67 at 16-17 (citing *Arizona*, 567 U.S. at 400-02). The INA's entry and reentry crimes are far less detailed than the alien-registration provisions, which define extensively what, when, how, and with whom aliens must register. *Compare* 8 U.S.C. §§ 1325, 1326, *with* 8 U.S.C. §§ 1301-06. Those provisions also uniquely limit enforcement of registration crimes to specific "person[s] authorized" by the "Attorney General." 8 U.S.C. § 1304(c). Unsurprisingly, the Court has declined to extend *Arizona*. *See Garcia*, 589 U.S. at 210.

Regardless, preemption may not be "inferred merely from the comprehensive character" of federal law alone. *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973). In *Arizona*, the Court relied on both comprehensiveness and the unique federal interests involved. *See* 567 U.S. at 400-03. Plaintiffs do not identify any similarly unique

federal interests in alien movement, nor do the ones in *Arizona* translate here. There, registration of "perfectly law-abiding" aliens created expectations for other nations about the "protection of the just rights of a country's own nationals when those nationals are in another country." *Hines v. Davidowitz*, 312 U.S. 52, 64-66 (1941). Those expectations stemmed from "obligations" under treaties and the "customs defining with more or less certainty the duties owing by all nations to alien residents." *Id.* at 65. But entry crimes affect only *non-law-abiding* aliens. *See id.* at 64-66. Other nations do not have as strong an interest in protecting those non-law-abiding aliens, *see id.*, making it far less likely that Congress's "clear and manifest purpose" was to preempt a law like Florida's. *DeCanas*, 424 U.S. at 357. The district court claimed that *Arizona* did not differentiate based on law-abiding status, DE67 at 20, but *Arizona* incorporated the explanation in *Hines*, which *did*, for why Congress created alien-registration "as a harmonious whole." *Arizona*, 567 U.S. at 401 (cleaned up).

*Georgia Latino* does not hold otherwise. DE67 at 17; Order 8. There, this Court held that the INA preempted the field of "transportation, harboring, and inducement of unlawfully present aliens." *Ga. Latino*, 691 F.3d at 1266. But transporting and harboring are special because Congress has specifically limited state participation to arrest for those activities (and created special evidentiary rules). *Id.* at 1264 (citing 8 U.S.C. § 1324(c)-(d)). Though claiming that the INA similarly "confin[es] the prosecution of [illegal entry and reentry] to federal court," the district court cited nothing to support that conclusion. DE67 at 18. Nor could it, as the federal entry and reentry crimes

contain nothing like Section 1324(c). If the district court was referring to the idea that federal crimes are prosecuted in federal court, that just describes the consequences of the "overlap" in criminal law. *Garcia*, 589 U.S. at 212.

At its core, the district court's stance flouts both the presumption against preemption and history. States have directly regulated aliens for centuries. Around the Founding, "States enacted numerous laws restricting the immigration of certain classes of aliens, including convicted criminals[.]" *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part, dissenting in part). States have routinely barred aliens from owning real estate, *see Terrace v. Thompson*, 263 U.S. 197, 217 (1923); *see also* Allison Brownell Tirres, *Ownership Without Citizenship: The Creation of Noncitizen Property Rights*, 19 Mich. J. Race & L. 1, 10 (2013), and from taking part in the "resources of the people of the state," *Truax v. Raich*, 239 U.S. 33, 39-40 (1915) (citing cases). States disarmed aliens, *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022), and limited their rights to "vote, hold public office, or serve on juries," Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). National debates near the Founding also reveal an understanding of broad state power over aliens. *Tirres*, *supra*, at 20 (first Naturalization Act); *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part, dissenting in part) (Alien and Sedition Acts); *Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102, 148-49 (1837) (Thompson, J., concurring) (resolution by Congress of the Confederation). That history supports a "presumption against preemption" with its "greatest force," *CTS Corp.*, 573 U.S. at 7, 19.

b. Even if there were some field preemption over alien entry, admission, and removal, SB 4-C is still not preempted. State laws with only "some indirect effect" on preempted fields "[are] not pre-empted." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 308 (1988). Florida's law does not dictate which aliens may enter the country or where or how to enter, regulate the process of admission, or implement a process of removal from the country. SB 4-C faithfully respects federal determinations that an alien may "remain in the United States temporarily or permanently." Fla. Stat. § 811.102(4)(a). And where an alien travels unassisted into Florida, it does not directly implicate the separate field of "prohibitions on the transportation" "of unlawfully present aliens," *Ga. Latino*, 691 F.3d at 1266, because someone *other than the alien* must provide that transportation.

Even if the Court takes a broader view of the field of alien entry, SB 4-C is not *facially* field preempted. Florida's law does not directly operate in such a field—even if alien entry extends to criminalizing unlawful entry at the country's borders—in every application. *See Salerno*, 481 U.S. at 745. If an alien enters the country illegally in Texas and then travels to Florida, SB 4-C would not operate even in that overly broad conception of the field of alien entry.

## 2.    SB 4-C is not conflict preempted in all applications.

Plaintiffs have also not surmounted the "high threshold" for conflict preemption. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion). The district court erroneously found that SB 4-C interferes with federal enforcement

discretion in the same ways "as the noncitizen registration law struck down in *Arizona*," DE67 at 23, and that SB 4-C "creates an entirely separate enforcement scheme for essentially the same conduct regulated by the federal government," *id.* at 24.

That conclusion cannot be squared with *Garcia.* Prosecutorial discretion exists for every criminal law, so the district court's reasoning would extend to any state law that overlapped with federal law. Again, mere "overlap" in federal and state criminal law does not equal preemption. *Garcia*, 589 U.S. at 212. Countless crimes are duplicated at the state and federal levels, from murder to racketeering conspiracies to kidnapping to child pornography. Every time a state prosecutes someone under those statutes, it enforces a "separate enforcement scheme for essentially the same conduct." DE67 at 24. And "the possibility that federal enforcement priorities might be upset is not enough" either. *Garcia*, 589 U.S. at 212; *see also id.* at 202 ("'Invoking some brooding federal interest or appealing to a judicial policy preference' does not show preemption."). Preemption arises instead from "'the Laws of the United States,'" not the "enforcement priorities" or "preferences" of federal officials. *Id.* at 212.

Though federal enforcement discretion does not "provide a basis for preemption," Plaintiffs have not even shown conflict with that discretion in every case. *Garcia*, 589 U.S. at 212; *see also Salerno*, 481 U.S. at 745. Many Florida law-enforcement agencies have signed Section 287(g) agreements with the federal government. *See* 8 U.S.C. § 1357(g). Those agreements grant those agencies "[t]he power and authority to arrest," to "maintain custody," "to interrogate," and "prepare charging documents" for aliens

based on violations of federal immigration law. *E.g.*, *Memorandum of Agreement*, ICE, https://tinyurl.com/5epbw6vf (agreement with Florida Highway Patrol). When Florida officials enforce both federal and state law for the same criminal activity by aliens, there can be no conflict with federal enforcement discretion, certainly not in every case as required for Plaintiffs' facial challenge. *Salerno*, 481 U.S. at 745. Because "[f]ederal authorities play[] a role" in state enforcement actions by "support[ing]" state officials through Section 287(g) agreements, those actions cannot "frustrate[] any federal interests." *Garcia*, 589 U.S. at 212.

For its part, the motions panel leaned on *Arizona*'s preemption holding drawn from Congress's alien removal system. Order 8. The Supreme Court held that Arizona's provision authorizing arrests for removable illegal aliens was conflict preempted because "[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States." *Arizona*, 567 U.S. at 409. "Decisions of this nature," the Court wrote, "touch on foreign relations and must be made with one voice." *Id.* Yet SB 4-C does not implicate these same concerns because it is unrelated to whether an alien should be removed from the country.

Nor does *Georgia Latino* support a finding of conflict preemption. That case dealt with "transportation" by other individuals "of unlawfully present aliens" and Congress specifically limited state participation to arrests under that provision. *Ga. Latino*, 691 F.3d at 1264 (citing 8 U.S.C. § 1324(c)). Congress also dictated specific "evidentiary rules governing prosecution of" those offenses and "mandate[d] a community outreach

program" on that section. *Id.* (citing 8 U.S.C. § 1324(d), (e)). The federal entry and reentry crimes contain nothing of that ilk.

In any event, this Court should cabin *Georgia Latino*. In *Georgia Latino*, this Court relied on Congress's criminalization of transportation and was also concerned that state enforcement of overlapping crimes would "threaten the uniform application of the INA" and potentially implicate foreign-policy interests unmoored from the INA's text and structure. *Id.* at 1266. That reasoning defies *Garcia* and should not be extended. *See* 589 U.S. at 202, 212. There is "a difference between following a precedent and extending a precedent." *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). *Garcia* "undermined"—indeed rejected—the "reasoning" of those "moribund" decisions, so this Court should not "extend [those precedents] by even a micron." *Id.*

### D. SB 4-C does not violate the Dormant Commerce Clause.

The Dormant Commerce Clause prevents economic discrimination between States, meaning "measures [purposefully] designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

Florida's law has nothing to do with economic protectionism. It does not "benefit in-state economic interests by burdening out-of-state competitors," *id.* at 369; it seeks to deter the influx of illegal aliens into Florida (no matter their residence) and prevent the many problems (social, moral, and criminal) that follow. The unnamed Plaintiffs prove that: Though they are Florida residents, they are subject to SB 4-C. And

nothing "disclose[s] purposeful discrimination against out-of-state" interests under the Supreme Court's balancing framework. *Id.* at 379.

The district court cited *Edwards v. California*, 314 U.S. 160 (1941), to say that States may not prohibit any crossing of state borders by individuals because it is "commerce." DE67 at 25-26. But if that is commerce, Congress has affirmatively prohibited it, 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1325(a), and so the Dormant Commerce Clause does not apply. *United States v. Texas*, 97 F.4th 268, 332 (5th Cir. 2024) (Oldham, J., dissenting); *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154 (1982) (because the Dormant Commerce Clause doctrine "safeguards Congress' latent power from encroachment," courts only apply that doctrine "when Congress has not acted or purported to act"). Still more, the law in *Edwards* was clearly protectionist. It barred the transportation of "indigent *non-residents*" into California—expressly discriminating against out-of-state economic interests. 314 U.S. at 174 (emphasis added).

## II.   THE REMAINING EQUITABLE FACTORS DO NOT SUPPORT AN INJUNCTION.

The equities favor the State. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, No. 24A884, slip op. at 25 (U.S. June 27, 2025) (alteration and quotations omitted). Even more so when a law regulates "harmful, constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

Florida's interest in ensuring individuals in its territory are inspected is legitimate. There can be no doubt that "enforcement of [SB 4-C] will decrease illegal border

crossings and associated harms like drug and human trafficking," *Texas*, 97 F.4th at 334 (5th Cir. 2024) (Oldham, J., dissenting), yet the State is unable to utilize SB 4-C to address this crisis.

Plaintiffs also have unclean hands. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands."). Plaintiffs seek a preliminary injunction to protect illegal conduct such as driving without a license, working without authorization, and avoiding detection for criminal illegal entry. "Few things are clearer than that one who comes seeking protection for conduct that he concedes to be criminal has unclean hands within the meaning of this principle." *Combs v. Snyder*, 101 F. Supp. 531, 532 (D.D.C. 1951), *aff'd*, 342 U.S. 939 (1952); *see also Nat'l Coal. of Latino Clergy, Inc. v. Henry*, No. 07-CV-613, 2007 WL 4390650, at *1, *9 (N.D. Okla. Dec. 12, 2007).[13]

## III. THE DISTRICT COURT LACKED AUTHORITY TO BIND FLORIDA'S LAW-ENFORCEMENT OFFICERS.

At a minimum, this Court should narrow the scope of the injunction. *See, e.g.,* Order, *Garcia v. Exec. Dir., Fla. Comm'n on Ethics*, No. 23-12663 (11th Cir. Nov. 30, 2023). The district court determined that, under Rule 65, it could bind all law enforcement officers. The panel refused to stay the scope of the injunction. Order 9-13. It did

---

[13] There may be cases where a person's status as an illegal immigrant does not foreclose equitable relief. But it is not this case. Here, Plaintiffs seek to facilitate unrelated violations of law through this lawsuit, and that is fatal to their request for equitable relief.

so through alternative, hypothetical holdings. If Plaintiffs were right that Defendants sufficiently control law enforcement, the panel stated that there was no need to narrow the injunction. Order 10. But if Defendants were right, the panel reasoned, Defendants lack appellate standing because the binding of law enforcement "do[es] not affect [Defendants'] interests." Order 12. Both suppositions are flawed.

## A. The district court erred in binding non-party law enforcement.

Under Rule 65, a court's order may "bind[] only" those who receive "actual notice" and fall into one of three categories: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with" the parties or their officers or agents. Fed. R. Civ. P. 65(d)(2); *see also United States v. Robinson*, 83 F.4th 868, 878 (11th Cir. 2023). That rule "embod[ies]" the historic limits of equitable power and codified the background principles that had long guided equity courts. *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017). Traditionally, a litigant was "not bound by a judgment to which she was not a party," *Taylor v. Sturgell*, 553 U.S. 880, 888 (2008), ensuring that all persons "have their day in court." *Alemite*, 42 F.2d at 832-33. Rule 65 honors those traditional principles by limiting a court's injunctive power to parties, those acting on behalf of parties, or those helping parties avoid the court's order. *See Robinson*, 83 F.4th at 878, 881.

Because Plaintiffs have not shown that Florida law-enforcement officers fit those criteria, the Court should narrow the injunction to cover only Defendants and those who, as a matter of fact, aid or abet efforts by Defendants to violate the injunction.

1. The first criterion is easy: "It is undisputed that law enforcement agencies are not named parties." DE67 at 38.

2. The second criterion also is not met. Law-enforcement officers are not Defendants' "officers, agents, servants, employees, [or] attorneys." Fed. R. Civ. P. 65(d)(2). Though Rule 65 does not define those terms, Congress presumptively "incorporate[d] the established [common-law] meaning of these terms." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989); *see also Robinson*, 83 F.4th at 880 (defining "employee" in Rule 65 according to the common law). To fall within the common-law definitions of the categories in Rule 65(d)(2)(B), law-enforcement officers must both be subject to Defendants' control and wield authority to act on Defendants' behalf.[14] Neither element is met, because local law-enforcement agencies are independent from prosecutorial agencies under Florida's constitutional scheme.

Florida law makes the division between prosecutors and law enforcement clear. In Florida, law-enforcement and prosecutorial agencies derive powers from separate

---

[14] *See, e.g.*, Restatement (Third) of Agency §§ 2.01, 2.03 (Am. L. Inst. 2006) (agency); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (employees); *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003) (servants); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 557 n.9 (11th Cir. 1998) (officers).

constitutional[15] and statutory[16] sections. None of those sections grant Defendants control over law-enforcement officials, whereas Florida law is typically explicit when it grants such control. *See* Fla. Const. art. IV, § 4(b) (creating statewide prosecutor under the Attorney General's office); Fla. Stat. § 27.18 (permitting state attorneys to hire subordinates). Underscoring Defendants' lack of control, Defendants cannot remove or discipline law-enforcement officers, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) ("[E]xecutive power without the Executive's oversight" "subverts the President's ability to ensure that the laws are faithfully executed[.]"), nor do law-enforcement agencies draw their funds from Defendants' budgets, *see, e.g.*, Fla. Stat. § 30.49 (sheriffs' offices budgets). To top it off, many law-enforcement officers are elected by different constituencies, *e.g.*, Fla. Const. art VIII, § 1(d) (sheriffs), or appointed by different governments, *e.g.*, City of Miami Charter ch. 42, § 42-2 (police chief appointed by city manager).

This Court has thus recognized the separation between law-enforcement and prosecutorial entities in Florida. *See City of South Miami*, 65 F.4th at 641 (Florida Attorney General cannot "control" local law enforcement). In *City of South Miami*, the plaintiffs

---

[15] *Compare* Fla. Const. art. IV, § 4(b) (creating the Attorney General and statewide prosecutor); *id.* art. V, § 17 (creating state attorneys), *with id.* art. VIII, § 1(d) (creating sheriffs).

[16] *See, e.g.*, Fla. Stat. § 16.01 (Attorney General); Fla. Stat. §§ 27.02-.13, 27.18-.25 (state attorneys); Fla. Stat. § 30.15 (sheriffs); Fla. Stat. § 943.04(2)(a) (Florida Department of Law Enforcement); Fla. Stat. § 321.05 (Florida Highway Patrol); *see also* City of Miami Charter subpart A, § 24 (Miami Police Department).

argued that their alleged injury—discriminatory arrest by law-enforcement officers—was "traceable to the" "attorney general" "because [he has] sufficient control over local law enforcement." *Id.* This Court rejected the claim. Because the plaintiffs "offered nothing to prove" that the attorney general could "control" law enforcement or "curtail" injuries committed by "local officials who [were] not parties to th[e] action," their injuries were not traceable to the Attorney General. *Id.* at 641-42; *see also Jacobson*, 974 F.3d at 1253 (voting injuries caused by local Supervisors of Elections were not traceable to Secretary of State because Supervisors "are not subject to the Secretary's control"). That analysis controls here.

The district court held that, despite the lack of *legal* control, Defendants exercised enough "practical[]" control over law-enforcement entities to make them Defendants' "agents." DE67 at 38-41. But it is the "right to control," not practical control, that defines the agency relationship. *General Bldg. Contractors v. Pennsylvania*, 458 U.S. 375, 393-95 (1982). So practical sway over local officials is legally irrelevant. If such indirect control established agency, every law-enforcement officer could bind the Attorney General to contracts, Restatement (Third) of Agency § 6.01, or subject him to liability under *respondeat superior*, *id.* § 7.04. That is not the law. *Cf. State v. Spradlin*, 12 S.W.3d 432, 434 (Tenn. 2000) ("Police officers" lack "authority to bind the [] attorney general" "not to prosecute.").

In any event, the district court's evidence of practical control was weak. First, the court thought that the Attorney General's "power to file suit" against local officials

established sufficient control. DE67 at 39 n.24. This Court rejected that premise in *Jacobson*, 974 F.3d at 1253 ("That the Secretary must resort to judicial process if the Supervisors fail to perform their duties underscores her lack of authority over them.").

Next, the district court cited the Attorney General's tweets discussing "direction[s]" he has given to law-enforcement officials. DE67 at 39-40. Those directions establish no "right to control." *General Bldg. Contractors*, 458 U.S. at 393-95. Plus, most of those tweets involved law-enforcement agencies headed by a multi-member board on which the Attorney General sits. *See* Fla. Stat. § 20.201 (Florida Department of Law Enforcement); Fla. Stat. § 20.24 (Florida Highway Patrol). But the Attorney General's position on those boards does not give him control over those agencies in his singular capacity. *See Support Working Animals*, 8 F.4th at 1204 & n.4 (indicating that the Attorney General does not have control over FDLE by nature of that relationship).

Finally, the district court noted that the Attorney General is Florida's "chief state legal officer," and that Florida courts give his opinions "careful consideration." DE67 at 40-41. Yet as the district court acknowledged in the same breath, the Attorney General's opinions are "not binding." *Id.* at 41.

3. Nor are law-enforcement officers invariably in "active concert or participation" with Defendants. Fed. R. Civ. P. 65(d)(2)(C). That is a narrow circumstance. *See ADT*, 853 F.3d at 1352. After all, courts of equity "cannot lawfully enjoin the world at large," and basic notions of due process entitle each person to "have their day in court." *Alemite*, 42 F.2d at 832-33. For that reason, courts generally may bind only parties,

*CASA*, slip op. at 7, and usually may bind non-parties under the "active concert or participation" exception only when a party is attempting to avoid the injunction through "craftiness" with the non-party, *Robinson*, 83 F.4th at 885. Non-parties thus fall within the "active concert or participation" exception in two "limited" circumstances: when they are in "privity" with a party, or when they "aid and abet the party" to violate the injunction. *Id.* at 881.

Plaintiffs have not shown either basis.

i. To begin, law-enforcement officers lack privity with Defendants. "[P]rivity" is a "legal conclusion" about the relationship between two individuals. *ADT*, 853 F.3d at 1352. It exists only when a non-party "can be legally identified with an enjoined party," such that enjoining the non-party comports with due process. *Robinson*, 83 F.4th at 884. That designation is reserved for a Defendant's "successors and assigns" (inapplicable here) and those with whom Defendants share a "legal identity." *Id.* To share legal identity, the non-party must have both (1) "a very close identity of interest" with the party, and (2) exercise "such significant control over the [party] *and* the underlying litigation that it is fair to say that the nonparty had his day in court." *Id.* That "limited class" prevents a party from "circumvent[ing] a valid court order merely by making superficial changes" in form. *Id.* at 884-85. At the same time, strict adherence to the elements of legal identity is necessary to "keep the scope of contempt liability within the limits of due process." *Id.* at 884.

Try as they might, Plaintiffs cannot squeeze law-enforcement officers into the very limited legal-identity category.

First, it is elemental that law-enforcement officers do not exercise "significant control over the [Defendants]" or control over "[this] litigation." *Robinson*, 83 F.4th at 884. They are separate constitutional entities, *see supra* 39-43, and law enforcement in Florida have not participated in any part of Defendants' litigation strategy.

Second, Plaintiffs have not shown a sufficient identity of interests either. Even if the lack of control were not dispositive, that lack of control at minimum magnifies Plaintiffs' need to show a substantial parity of interests. *See Taylor*, 553 U.S. at 894, 901 (more than "identity of interests and some kind of relationship" is needed for privity).

Plaintiffs have not met that great burden. Law-enforcement officers are interested in arresting and "prevention and detection of crime," Fla. Stat. § 943.10(1), whereas state attorneys and Attorneys General are concerned with prosecution and legal process, *see* 1983 Fla. Op. Att'y Gen. 253 (1983) (state attorneys are not "law enforcement officers"). That latter "role" implicates "their status as officers of the court," *Valdes v. State*, 728 So. 2d 736, 739 (Fla. 1999), in which they "represent the interests of the people of the State of Florida, not the interests of [an] arresting police officer." *Gentile v. Bauder*, 718 So. 2d 781, 783 (Fla. 1998).

For that reason, a host of courts hold that prosecutors are not in privity with arresting officers.[17] This Court has held, for example, that a sheriff, "neither individually nor as sheriff," "shared an identity of interest" with the "prosecutor in [a] criminal case." *Wilson*, 757 F.2d at 1237. Thus, this Court held in *Wilson* that a trial court's prior finding of a lack of probable cause in a criminal prosecution litigated by state prosecutors was not res judicata as to the sheriff in later litigation involving the identical question. *Id.* And that makes sense. The "interests and incentives of the individual police or officials" are not aligned with the prosecution. *Bilida*, 211 F.3d at 170. Though police have a "working relationship" with prosecutors, "it is not 'sufficiently close' to establish privity." *Dewey*, 433 F. Supp. 3d at 346; *see Wilson*, 757 F.2d at 1237.

Where officers are separately elected, as several types of officers are here, they serve even more fundamentally different interests—those of different electorates. "Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents." *Keller v. State Bar*, 496 U.S. 1, 12 (1990). But the law-enforcement officers here are elected by different jurisdictions with different constituencies. Even in the same jurisdiction, those officers may feel as if the mandate from "their constituen[cies]" differs from other elected officials in the

---

[17] *See, e.g., Wilson v. Attaway*, 757 F.2d 1227, 1236-37 (11th Cir. 1985); *Bilida v. McCleod*, 211 F.3d 166, 170-71 (1st Cir. 2000); *McCoy v. Hernandez*, 203 F.3d 371, 374-75 (5th Cir. 2000); *Morgan v. Gertz*, 166 F.3d 1307, 1309 (10th Cir. 1999); *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998); *Washington v. Dewey*, 433 F. Supp. 3d 334, 346 (D. Conn. 2020).

same place. *See id.* The unique interests of separately elected officials make the doctrine of privity ill-suited to this context.

ii. Next, there is no evidence of aiding and abetting. Such a showing requires (1) "the commission of the underlying offense by someone" other than the abettor, (2) "a voluntary act or omission" by the abettor, and (3) "a specific intent that such act or omission promote the success of the underlying criminal offense." *Havens v. James*, 76 F.4th 103, 115 n.13 (2d Cir. 2023); *see also United States v. Coats*, 8 F.4th 1228, 1248 (11th Cir. 2021). Under Rule 65, the underlying offense is a violation of the injunction, which requires that the enjoined party or its agents take some affirmative "act[] in violation of the injunction." *Robinson*, 83 F.4th at 885. That requirement flows from the proposition that one cannot aid and abet their own actions alone. *See Nigro v. United States*, 117 F.2d 624, 630 (8th Cir. 1941).

Here, there is no evidence that Defendants have taken or will take any "act[] in violation of the injunction." *Robinson*, 83 F.4th at 885. Defendants are fully committed to abiding by the district court's orders while they challenge them. So long as they do so, there will be no "underlying crime" for officers to aid or abet. *Rosemond v. United States*, 572 U.S. 65, 70 (2014). And even if arrests occur, not *every* law-enforcement officer aids and abets a violation of the injunction *every* time they arrest under SB 4-C. Rather, officers will aid and abet only when their arrest "promote[s] or facilitate[s] the commission" of Defendants' own violation. *Id.* at 71. If officers arrest without any connection to or involvement from Defendants, those officers aid and abet nothing, and

thus fall beyond the district court's equitable reach. Anything more would empower courts to "enjoin the world at large" and "to declare conduct unlawful," *Alemite*, 42 F.2d at 832-33—an act forbidden by circuit precedent. *See Jacobson*, 974 F.3d at 1255 ("[F]ederal courts have no authority to erase a duly enacted law[.]").

iii. Despite this Court's instructions in *Robinson* and *ADT*, the district court engaged with none of that analysis. It simply forged its own test for whether parties are acting in concert or participation. DE67 at 42 (asking whether there was "a purposeful acting of two or more persons together or toward the same end" or "a purposeful acting of one in accord with the ends of the other"). That defies precedent.

Compounding the problem, the district court erred under its own standard. It reasoned that law-enforcement officers "purposeful[ly] act[] . . . together or toward the same end" as the named Defendants because they "conduct arrests" so that prosecutors may "prosecute charges." DE67 at 42. But Florida prosecutors are enjoined from prosecuting crimes under SB 4-C, so prosecutors may not work "together" with "or toward the same end" as law enforcement to enforce SB 4-C. *Id.* Even more, the district court's underlying premise—that arrests are merely precursors to prosecution—is wrong. Officers take action "for a wide variety of purposes," like deterrence or public safety, even if those purposes are "wholly unrelated to a desire to prosecute for crime." *Terry v. Ohio*, 392 U.S. 1, 13 (1968). For example, an officer may arrest a batterer for domestic violence hoping to defuse the situation, knowing from prior experience that the victim will decline to press charges.

48

The court also incorrectly asserted that privity between state officials is irrelevant when suing "state officials in their official capacities" because such suits are "no different from a suit against the State." DE67 at 45 n.31. The entire point of *Ex Parte Young* is that suits against state officials *are* different than suits against the State. *See Stewart*, 563 U.S. at 255 (Suit against a state official could proceed despite a state's sovereign immunity because "he is not the State."). Were it otherwise, a plaintiff would need standing to sue just one state actor to open the spigot to injunctive relief against all state actors. That ignores *Jacobson, Support Working Animals,* and *City of South Miami,* which teach that plaintiffs may not obtain relief against "independent officials" merely by suing one state officer. *Jacobson*, 974 F.3d at 1253.

Last, the district court's understanding of state-actor litigation flouts traditional notions of claim preclusion. Privity in this context is the same as privity in the res-judicata context. *ADT*, 853 F.3d at 1352. On the district court's understanding of privity, though, rulings against one state actor would bind in future cases against all state actors. This Court has rejected that view. *See Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1580 (11th Cir. 1985).

\*     \*     \*

It is worth pausing to consider how the district court's vision of equity would upend other areas of law. Under that view, once any court holds a state law unconstitutional, it may enjoin *any person* from enforcing the law, even non-parties removed from the named defendants. *See* DE67 at 42-43. Even worse, it would hold the Attorney

General and state attorneys liable for the actions of those who they cannot control and have not encouraged in any way. That would open the door to a harrowing possibility: elected officials of a sovereign state, acting in full accordance with court orders, could be made criminals "against [their] consent, and by the mere rashness or precipitancy or overheated zeal of another." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489 (2023). This Court should not countenance that approach.

## B.    The motions panel's appellate standing analysis was wrong too.

Alternatively, the panel "suppose[d]" that if the Attorney General lacked control over law enforcement, he would lack appellate standing to challenge the scope of the injunction. Order 11.

That analysis "misapprehends the nature of this [C]ourt's jurisdiction" by treating parts of an order as separable. *GuideOne Specialty Mut. Ins. Co. v. Missionary Church of Disciples of Jesus Christ*, 687 F.3d 676, 682 n.3 (5th Cir. 2012). But to obtain appellate standing, "the appealing party need only be aggrieved by a judgment." *Id.* Once jurisdiction exists, appellate courts "have broad authority to dispose of district court judgments as they see fit." *Id.* (citing 28 U.S.C. § 2106). So "an appellate court that has jurisdiction over an interlocutory order containing injunctive relief may reach and decide other aspects of that order even though the others would not be reviewable independently by

interlocutory appeal." *Myers v. Gilman Paper Corp.*, 544 F.2d 837, 847 (5th Cir. 1977);[18]

*see also League of Women Voters v. Sec'y of State, Fla.*, 66 F.4th 905, 945 (11th Cir. 2023)

(confirming Florida officials' appellate standing to challenge injunctions against the en-

forcement of state law—even officials not "bound"—because of the "states' strong

interests in defending" "their laws"). There is no question that the Attorney General

has standing to challenge the injunction overall. Order 12. The Court may thus consider

the injunction's scope.

Plus, the scope of the injunction indeed "affect[s]" the Attorney General's inter-

ests. Order 12. Parties have appellate standing when an order imposes "some detri-

ment" on them. *See Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 869 (6th Cir.

2015). Because that order treats law-enforcement officers as his agents, DE67 at 41, the

Attorney General can be held responsible for their actions, though he neither authorizes

nor controls their actions. *See PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205,

1213 (11th Cir. 2019) (a party may be held in contempt for its agents' actions). If the

preliminary injunction stands, the Attorney General must therefore devote resources—

in fact, he already has—to promote compliance by non-parties that he does not control.

That is more than enough for appellate standing.

_____

[18] *Myers* is binding. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

# CONCLUSION

The Court should vacate the injunction, or at a minimum narrow the injunction's scope, and reverse.

Dated: June 30, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

/s/ *Robert S. Schenck*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
NATHAN A. FORRESTER (FBN 1045107)
  *Chief Deputy Solicitor General*
ROBERT S. SCHENCK (FBN 1044532)
CHRISTINE PRATT (FBN 100351)
  *Assistant Solicitors General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
Phone: (850) 414-3300
Facsimile: (850) 410-2672
*jeffrey.desousa@myfloridalegal.com*
*nathan.forrester@myfloridalegal.com*
*robert.schenck@myfloridalegal.com*
*christine.pratt@myfloridalegal.com*

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,996 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Robert S. Schenck*
Assistant Solicitor General

**CERTIFICATE OF SERVICE**

I certify that on June 30, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ Robert S. Schenck
Assistant Solicitor General